## JIM LANSDALE v. STATE.

No. A-6842.    Opinion Filed Nov. 2, 1929.
(282 Pac. 170.)

124

I. L. Cook, for plaintiff in error.

Edwin Dabney, Atty. Gen., and J. H. Lawson, Asst. Atty. Gen., for the State.

DAVENPORT, J.  The plaintiff in error, hereinafter for convenience referred to as the defendant, was convicted in the district court of Atoka county on a charge of stealing hogs, and was sentenced to imprisonment in the state penitentiary for two years.  Motion for new trial was filed, considered, and overruled, exceptions saved, and the case appealed to this court.

The substance of the state's testimony is as follows:

O. T. Armstrong stated he knew the defendant, Jim Lansdale; that on or about the 17th day of February, 1927, he lost four hogs.  Witness described the hogs, and stated the hogs ranged over on Grassy Hollow, close to the mouth of Little Caney.  Grassy Hollow is in Atoka county.  The defendant lives in Atoka county.

"I found the hogs in a pen in this town.  I got the hogs back.  I did not give Jim Lansdale or any one else permission to take the hogs out of that county, nor did I sell them to any one.  Defendant has been living in about two miles of me for more than a year.  He was living in this country before I was.  I have seen him out on the range. He was inquiring about some hogs at one time.  My hogs was marked 'crop split to left, and underslope and underbit to the right.'  I have been using this mark about 18 months, right close to 2 years.  I have seen other hogs with the same mark around there since my hogs were taken. Prior to the time my hogs were taken, I had not seen this mark on any hogs but mine."

On cross-examination witness stated that prior to getting the mark up he used his father's mark, which was "crop split to left and overslope to the right."

"I put the underbit to make the difference between my hogs and my father's hogs. I have known Frank Tomlinson 9 or 10 years. He has had hogs and cattle out there all the time. I guess he has hogs. I have seen the cattle, and seen his hogs. Tomlinson has several marks out there. He has one mark 'crop and underhalf crop on the right and swallow fork underhalf on the left.' This mark is on Tomlinson's cows. I don't remember how many of his cattle I saw. I saw a hog at Jim Patterson's with that mark on it. My mark is not recorded. I have had my father's mark recorded since this arrest. I forget the mark Jim Lansdale was looking for when he was over at my place last spring. He had some hogs on the half with a fellow named Coss, I believe. No, I don't remember the mark; he said some was branded J on them; in a joking way I did say I would have to get the Lansdale boys in the penitentiary or they would get me there. I said somebody stole my hogs; we are going to have to find out who it is; if you prove yourself innocent, you will prove me guilty. I could not tell the jury exactly how I stated it."

On redirect examination witness stated in the preliminary trial defendant and other parties charged with him "tried to insinuate that I was stealing hogs." On recross-examination the witness stated:

"I do not spend all my time on the range; I am working in the field; I farm. I am not farming this year, but usually I have been working. I have made a field hand ever since I was seven years old; last year I spent a part of the time on the range. I am now staying at home, taking care of my hogs and breaking some land for another crop year. I have 15 hogs at home; they run from 125 to 10 pounds."

C. G. Heard, called as a witness for the state, said he lived at Stringtown. He bought seven head of hogs, one

red and six spotted like shoats, from Frank Tomlinson in February, 1927. They had been fresh-marked.

"I noticed one of them had its ear cut pretty near off. The condition of the ear did not arouse my curiosity. I asked Uncle Frank why he had cut the ear, and he said the boys had just traded for them, and had just remarked them. I paid him for the hogs; he called for the weight of the shoats, said he wanted them to show to the boys. The seven hogs came to something like thirty some odd dollars."

On cross-examination he stated that Mr. Tomlinson had said the boys had been trading.

"I have known him about seven years. I could not say how long I have been acquainted with him."

Will Beck testified in substance that he knew the defendant, Jim Lansdale; he had been living in and around the country where the witness had been for 15 or 20 years. Frank Tomlinson had been living in the country for about 12 years.

"On the 17th day of February, I saw the defendant and Bill Lansdale down in the vicinity of Grassy Hollow. I was going over to a man's by the name of Patterson to try to buy some hogs; as I passed along the road I saw Mr. Brumley, this defendant, and his brothers, Bill and Virgie, standing at the side of the road. I took it to be Jim hollowed to me, and I rode to where they were, and Jim, this defendant, said he was hunting for some hogs that belonged to Uncle Frank Tomlinson. He said some were marked 'crop in the left ear and possibly a split'; I saw some hogs near there, and Jim asked me if I knew whose hogs they were. I told him I did not; I was not familiar with the marks at that time. After that I saw a sow and several pigs, some black and some black with white spotted pigs in that vicinity. I took it to be the same hogs I saw the next morning in Frank Tomlinson's wagon about 9:30 or 10 o'clock. Mr. Tomlinson's wagon was at a blacksmith shop of old man Holders, at Potapo Neck, on the road

going west. I did not know Frank Tomlinson's mark at that time. Mr. Tomlinson gave my little girl a listed sow, marked with a smooth crop and split to the left and an underslope and underbit to the right. He had a sow and six shoats running around the house and yard all last winter. They were pretty good shoats, and this one was one of the hogs and unmarked at the time, and some time in March or April the hogs was marked. I do not know of any other parties that Frank Tomlinson has made a present of a hog since the trial."

On cross-examination, witness stated there was nothing peculiar about Mr. Tomlinson giving his little girl a hog.

"I have three cows of his, milking them, this summer; two cows marked with a smooth crop and split in the left ear and overslope and underbit in the right, and one is marked with a smooth crop and split in the left ear; don't know how long these cows marked with the overslope and underbit was marked, but seems to have been when they were young. I did not say the defendant came to the Patterson house and asked me about the mark on the hogs. He asked me about the smooth crop, and possibly a split in the left ear; there was nothing else about it, and I told him I did not know who gave the mark. We came on up the road, and Uncle Frank Tomlinson's dog was with them. I did not see the defendant any more that day. After I left Mr. Patterson's, I saw six or eight shoats, did not count them; they were sandy spotted and black, looked like one of their ears was cut off. I could not tell the ones that had the ear from the one that had the ear cut off. I could not tell whether the ears had been recently cut off or not; they did not look to be bloody, or anything like; they did not look to be raw like, like an old mark on them. The mark looked like an old mark; it did not look like a fresh one. I did not go out and examine them; I was about 30 steps from them. I was not much interested in them. Ote Armstrong did not come to see me about the hog Mr. Tomlinson gave my little daughter, but he asked

me about the marks. He asked me if the hog was marked with a crop and split to the left ear and an overslope and underbit to the right, and I told him it was; that Mr. Tomlinson had given it to my daughter. Mr. Armstrong, as far as I know, never came to look at the hog."

On redirect examination witness stated he saw Mr. Tomlinson the next morning after he saw the defendant and his brothers looking for the hogs.

"I told him, 'I see you have some of the hogs;' and he said, 'Yes; those are some I picked up around the house there.' That was at the Holder blacksmith shop on Neck Potapo. Mr. Tomlinson stopped there 10 or 15 minutes; while he was stopped there, Bennie Holder and Hendershot came up to the wagon, and I was sitting on the wagon. Mr. Tomlinson does not hear good. I looked at the hogs, and he told me they were some he had gathered up around the house. After Uncle Frank drove on, Bennie Holder and I talked about the marks, and Bennie said, 'Them hogs belong to Fugate;' and I told him 'No, I seen them hogs at the mouth of Caney, if I ain't mistaken.' I don't know whose hogs they were. I don't think I said in the preliminary trial that I told Bennie they were Frank Tomlinson's hogs. I don't think I swore they were anybody's hogs on the creek. I did not say to Bennie Holder they were Frank Tomlinson's hogs; he told me that."

Bennie Holder testified, on behalf of the state, that on or about the 17th day of February, 1927, he saw Frank Tomlinson near his father's blacksmith shop with some hogs in the wagon; a few shoats with some sandy spots on the back, the right ear was cut off; it showed not to have been done very long.

"I did not have any conversation with Mr. Tomlinson, but I did hear him talking with Mr. Beck. Mr. Beck asked him if he found his hogs, and he said, 'No, these are some I picked up around the place there.' I suppose he meant his place."

Charley Smith, a witness for the state, testified in substance he remembered the occasion of the hogs being sold over at Stringtown, and that the defendant was arrested, charged with the larceny of the hogs.

"Just prior to that time I was down in Grassy Hollow vicinity. I saw the defendant out there some two or three days before I learned the defendant had been arrested for taking these hogs. The day I was over there I saw some hogs, and also saw the defendant out there. The hogs I saw belonged to Ote Armstrong. There was one black gilt, one little black barrow, and one little black barrow with list, white up to the shoulders, and there was a little male, more list on the right than on the left. These hogs weighed about 50 pounds. They were marked, 'a crop and split to the left, and overslope and underbit to the right.' There was no ears cut off that day that I saw. When I saw them later in the stockyards at Atoka, their ears were chopped off. It appeared to be tolerably fresh."

On cross-examination witness stated that in the preliminary hearing—

"I said along about that time; I says, just a few days, or something like that, before it was learned that the hogs had been taken. When the prosecuting attorney asked me along about the 17th, I said: 'Yes, sir; something along about then I saw the hogs along the mouth of Grassy Hollow.' "

Witness stated:

"I am hauling lumber, and when I am not hauling lumber I am working around the place and raising a few hogs. I have a sow and four pigs is all I own. I have got my individual hogs out there; to make a living, I work at first one thing and then another. I have a few hogs to sell. I guess the hogs they have been selling belong to us—Ote. I did not say I had seen these hogs around Grassy Hollow on the 17th; it was along about that time. I was there pretty nearly every day looking for hogs and so on. I

had one sow, and my little girl, she owned a few pigs. My hogs was in the Ote Armstrong mark. I never saw this mark on any other hogs."

O. P. Ray, the sheriff, said he looked at the hogs Mr. Armstrong identified as his.

"I found the hogs in the stockyards here in Atoka that had been described to me as belonging to Armstrong. The hogs had been fresh marked in the right ear. I arrested the defendant in connection with these hogs. When all four of them was together, the defendant said he got those hogs up for Frank Tomlinson; said he and Virgie and Bill went down to Grassy Hollow and drove them up. The other two boys corrected him, saying one of them quit on the mountain, and the other quit just before they got to the house. The defendant said the hogs came on to the house and he put them in the lot; that he got them up for Frank Tomlinson. Mr. Tomlinson stated he got the red sow from Mr. Tucker; it was his hog; that he hauled the others to town for the Lansdale boys. I suppose they were their hogs."

On cross-examination, witness stated Mr. Tomlinson was hard of hearing and a little slow of speech; he did not know what mark Mr. Tomlinson gave.

"I have not known much of him for the last 12 years. I have not seen much of him."

This is in substance the testimony of the state. The defendant in substance introduced the following testimony:

J. W. Patterson testified he knew Jim Lansdale; had known Frank Tomlinson four years.

"I know his hog mark and have known it since that time. It is 'crop and split to the left, and overslope and underbit on the right.' I have one of his cows in my possession, and I bought a hog from him. I have the hog over at my place; it is about 1½ years old. Shortly after I moved

where I am living, I had a conversation with Ote Armstrong about the Lansdale boys. He said they were Socialists; we had to get them out of the country; they were all flocking in on us. Later he came to me, where I was making ties with a gun, 30-30, with the hammer back, and he say, 'Patterson, how come that wagon turned around over there and loaded hogs;' and I said, 'Ote, I never knew anything about it.' And I said I was making ties right here, but I don't know who loaded the hogs, and you don't mean to implicate me stealing hogs, did you, but you saw whoever loaded out these hogs, and I said Ingram is the one who turned around there. He said, 'I know who stole my hogs, and I am going to kill the first man I see driving hogs out of these mountains;' and I said, 'I have a hog I own, and I will drive it where I please.' Armstrong then said, 'I will get the man that got these hogs; I am going to run them Lansdale boys out of here.' He—Armstrong—was hauling hogs out of there every night, and was hauling two loads every night, and he got 17 down near McGee. To my own knowledge he hauled these hogs, because I came from the tie woods after night, and me and my boy would ride in the wagon with him, and I asked him if he needed any help in loading the hogs, and he said they only weighed about 50 to 60 pounds."

On cross-examination by the county attorney the witness stated that his profession was laborer; he was farming for a living; that he farmed about 24 acres.

"I have been living in this country about 4 years; did not know if Mr. Tomlinson had any other marks, than the crop and split to the left and underslope and underbit to the right. I know he has given it for the last 4 years; he would call his hogs and feed them, and show them to me."

John Blankenship testified for the defense, and stated he knew Frank Tomlinson and the Lansdale boys. He was subpoenaed by the state as a witness. He saw Jim Lansdale on the 17th day of February, 1927, tolerably late in the afternoon.

"I went to get a sulky plow to plow in some oats. I had a conversation with Jim Lansdale, and asked him for his sulky plow; and he told me he penned some hogs, and I went down to the pen and looked at them. Uncle Frank claimed them, and I went to see them, and I said, 'I don't know Uncle Frank's hogs from any others.' Where I lived it was a regular hog hole, because I lived on the cane-brake farm. I could not tell whether they were the same hogs or not; there were so many that looked alike. Those shoats weighed about 60 or 70 pounds; every ear that had Uncle Frank's mark on them were clipped off. The ears looked like they had been clipped from one to two or three days. I had seen hogs that I had taken to be these hogs in the field; it was an old outfield that I had bought. It had been under fence once. I could not say just how long it had been. Uncle Frank claimed two bunches of hogs. Uncle Frank was there looking after his hogs, and asked me about a bunch of hogs, and I told him I thought it was the same hogs, but I could not be positive they were his hogs, only by his saying they were. His description of the hogs fitted the hogs I had seen. It had been probably 30 days since I had seen the hogs prior to the time I seen the hogs at Jim Lansdale's place. There was some listed hogs in the bunch, and Uncle Frank has been inquiring about listed hogs. He had a sow with one black sow pig, one black male pig, and two black barrows. When I went to the hog pen, my approach did not seem to excite them. These hogs ran south and east of my place, about a half a mile from Uncle Frank's place. I am a brother-in-law of the Lansdale boys."

Bertha Lansdale stated she lived on the other side of Stringtown. She remembered the hogs being penned at their place; it as about 1 or 2 o'clock when she noticed them.

"My husband came in about 20 or 30 minutes after I noticed them. I know Uncle Frank Tomlinson. At that time he was living in the house with us. I know his hog mark; it is a crop and split to the left and overslope

and underbit to the right. After that time Uncle Frank gave me $20 to keep for him, two 5's and one 10. He came in one day and asked me to put the money away for him; he was afraid somebody would knock him in the head, or he might lose it. Later he asked me for money and I gave him five, he got $10 later, and then he got 5."

On cross-examination witness stated she never saw any other mark that Mr. Tomlinson gave.

"I reckon Uncle Frank sold these hogs; Jim and Virgie and Uncle Frank loaded them. Uncle Frank brought some coffee and meal for me from Stringtown; if he brought a statement of the weight of those pigs, he never told me; I thought from the looks of the marks they had been marked three or four days; the ears were kindly scabbed. I think I had seen these hogs when they were little pigs, over at Mr. Tomlinsons."

Bill Lansdale testified, for the defendant, that in February 1927, he saw the defendant and Virge over to a man's by the name of Patterson.

"I stayed at Mr. Patterson's about 20 minutes. When we left Mr. Patterson's, Jim and Virge Lansdale was with me. We went to where the road goes off there on the mountain to Grassy Hollow, and Virge said, 'I believe I will go home,' and asked us to come on and eat dinner with him. After Virge left us, Jim and I walked some distance, and I told Jim I believed I would go home, and left Jim near Grassy Hollow. I saw him that evening. I passed his house, and he was at home; he was not driving any hogs at that time. I have known Frank Tomlinson's mark for about nine months; it is 'crop and split to the left and underslope and underbit to the right.' "

On cross-examination, witness stated they did not find the hogs before Virgil left them.

"I did not make a statement, when we were down there at the jail, as to any particular transaction. I told

them I had nothing to do with it, and never had seen the hogs. My brother Jim did not make a statement in my presence at the jail, that me and Virgil and himself went over there to Grassy Hollow to find the hogs. I knew nothing about the hogs being found. You probably went over the whole matter with Jim, but I know nothing about it. I did not see these hogs going ahead of Jim, nor did I see him driving them. I never saw these hogs."

Virgil Lansdale testified he was a brother of the defendant.

"After I left Patterson's home, I left Bill and Jim, and rode on around the hollow home; had not seen the hogs at that time. I went over to Jim's house next morning; we were making cross-ties over on the Beck land near his house."

On cross-examination witness stated the hogs' ears were not bloody the next morning, but they were remarked.

"I could not say they were fresh cut, but they had been cut recently; two or three days, looked like."

Frank Tomlinson was called as a witness on behalf of the defendant, and stated in substance that he had been using the mark, "crop and split to the left and overslope and underbit to the right," first and last, about 40 years; been using it in the county where these hogs are alleged to have been stolen for about 9 years.

"In February of this year, I was living on a place east of Stringtown, in the house with Jim Lansdale and his family. I remember, when I came home one afternoon, Jim had penned some hogs; I taken them to be my hogs. The left ear was in my straight mark and the right ear had been disfigured; some of them I thought I recognized by flesh marks. I brought these hogs down to Stringtown and sold them to Mr. Heard; when I took those hogs to Stringtown and sold them, I thought they were my

hogs. I don't remember telling Mr. Heard the boys had been trading and remarked the hogs. I did not say anything about who had re-marked them. I told Mr. Heard I wanted the weight of the red hog I got from Mr. Tucker; I wanted to show Tucker how big the hog was The only thing I remember mentioning about the Lansdale boys was that they guessed at the weights. This is the first time I have ever been charged with an offense. I have lived in this country about 40 years. I don't remember anything being said about a trade."

Witness, in response to a question of the county attorney, stated:

"I remember being in the sheriff's office, a part of the time you were there. I don't think I told the sheriff that the hogs belonged to the Lansdale boys, and that I was just taking them over to Stringtown for them. My recollection is that I did not tell the sheriff that. The place I speak of as my place is where Jim Lansdale was living. I did not think anything about hauling those hogs, any more than the rest of the hogs I have hauled off. These hogs run in the Bill Tucker pasture when they were pigs; they got to taking up with the Blankenship hogs around the Tucker place. Tom Tedford was living on the same place that Jim Lansdale afterwards lived on. Tedford died, and Lansdale moved up there. I was boarding with Jim Lansdale."

A number of the neighbors testified as to the reputation of Jim Lansdale, the defendant, for being a peaceable and law-abiding citizen.

The defendant testified, in his own behalf, that he was 29 years of age; he was born and reared in the country in and around Stringtown; on the 17th day of February, when he left Patterson's, it was about 10:30 or 11 o'clock.

"Virgil, Bill, Herbert, and myself went together on down the road about a quarter of a mile; Virge and Her-

bert left Bill and I there; Bill and I turned towards home; on the east side of the mountain Bill left me, and went on toward home. Up to the time Bill left me I had not seen anything of the hogs; a little ways on I heard the dog bark, and I learned he was barking at some hogs. I was about 150 yards from them; they run from the dog and went on across the mountain straight toward home. It was Frank Tomlinson's dog that was with me; there was a little creek, and when they went to cross it I got up to about 50 or 75 yards from them. I could tell some of them had their ears cut off at that time. The creek was up, and I turned and went up the creek to a foot log. I did not see the hogs any more until I got home; they were at the lot. I penned them in Frank Tomlinson's lot. John Blankenship came up about that time, and I asked Blankenship to go down and look at the hogs I had penned. I told him I judged they belonged to Uncle Frank; and he said, 'Yes; to the best of my knowledge they are Frank Tomlinson's hogs, by their flesh marks and their ear marks.' I noticed their ears had been cut, and said it looked like about two days. About 5 or 6 o'clock that evening Uncle Frank came in. I asked him to go down to the lot, and told him I had some hogs penned; I wanted to see if they were his; he said, 'They are my hogs; somebody has cut their ears off.' The following morning he wanted me to shoe his horse, and by the time I got the horse shod he had the wagon fixed, and wanted me to help him load the hogs. I helped him load the hogs. Uncle Frank held the team, and Virgil and I loaded the hogs in the wagon.. We loaded seven, six black and white spotted hogs and one red hog. You could tell a little of the mark after the ears had been cut; a little of the mark had been left, just a little overslope and underbit to the right. The mark in the left was plain. I have known this mark for two years, and have helped him mark some of his cattle with that mark. I remember telling the sheriff in the sheriff's office that the dog rallied these hogs on the west side of Grassy Hollow, on the mountain. I told him no one helped me drive the hogs to the lot; neither Bill nor Virgil Lansdale saw the hogs that afternoon. Virgil saw

them the next morning, when he helped me load them in the wagon."

On cross-examination, witness stated he did not remember saying in the presence of Mr. Ray, or any one, that "Virgil, Bill, and I found the hogs down on Grassy Hollow, and drove them up to my place. I don't remember making any statement to the officer that Bill had anything to do with driving the hogs. I told them Bill left me on the east side of the mountain; there was a great deal of confusion, and there was considerable talking."

The state called O. P. Ray in rebuttal, who testified with reference to conversations he claims to have had with Frank Tomlinson and the defendant, in which he claims Frank Tomlinson told him he had not paid much attention to the hogs; he just supposed the boys had brought them from the other place.

"The defendant made a statement to me that all three went over there and found the hogs, and the dog run them up the hill, and Virgil went on home. Jim's statement was they all went over there to get the hogs. He made two statements, and then I called the other boys in and asked them to repeat that statement. Virgil said he quit before he went up the mountain, and Bill said he quit him after he came to the mountain."

On cross-examination, witness stated the defendant said:

"I and the other boys gathered them for Frank Tomlinson. I called the other boys in, and they said this was not true. One said I quit as we came up the mountain, and the other said I quit as I went down the mountain."

We have at length set out the testimony on behalf of the state and defendant in order to arrive at the correct

conclusion as to whether or not there was sufficient testimony to sustain a conviction.

Section 2101, C. O. S. 1921, defines larceny as follows:

"Larceny is the taking of personal property accomplished by fraud or stealth, and with intent to deprive another thereof."

In this case the defendant contends that the evidence is insufficient to sustain the judgment; that he was living with Frank Tomlinson, who was the owner of the hogs on the range in and around his place, and that he had been looking for the hogs; that, as he was returning from Mr. Patterson's place, Mr. Tomlinson's dog came on some hogs near a place known as Grassy Hollow; that the hogs started in the direction of defendant and Frank Tomlinson's home. The hogs crossed a little creek, and defendant had to go some distance from where the hogs crossed the creek to a foot log in order to cross. When he got home, the hogs were there at his place, and he put them in a pen, believing them to be the hogs of Frank Tomlinson. When the hogs were penned, he discovered that a portion of their right ear had been cut off, almost destroying the mark on the right ear.

The testimony shows that the hogs were penned in a public place, and that later on Mr. Blankenship came to the house, and defendant had him look at the hogs to see if he thought they belonged to Frank Tomlinson. When Mr. Tomlinson returned home, he stated they were his hogs; that some of the right ear had been cut off. The next morning the defendant and his brother assisted Mr. Tomlinson in loading the hogs into his wagon, and Mr. Tomlinson left with the hogs to sell them. The testimony further shows that Mr. Tomlinson, with the hogs in his wagon, stopped at Holders place and visited for 10 or 15

minutes with some parties, one of whom got on the wagon and saw the hogs. Tomlinson talked with them about the hogs, and told them he was taking them to market. Tomlinson was driving along the public highway, and the record does not disclose there was any effort on his part to conceal the hogs or to keep any one from seeing them. There is some conflict as to the statements made by Mr. Tomlinson, when he sold the hogs, as to getting the weights, and also conflict in the testimony as to statements claimed to have been made by Tomlinson and defendant while at the jail, in talking to the sheriff and county attorney.

The testimony further shows that Mr. Tomlinson is hard of hearing, and it is necessary to talk rather loud to him to make him understand what was being said. Mr. Tomlinson testified to his mark, saying he had used that mark in that neighborhood for 10 or 12 years, and that when he saw the hogs in the pen at home, and when he hauled them to market, he believed them to be his hogs.

The prosecuting witness, Mr. Armstrong, according to his statement, had only been using his mark for about 18 months, and gave, as an excuse for putting the underbit in the ear of his hogs, it was done for the purpose of distinguishing his mark from his father's mark. Nowhere in the testimony does it appear that there was any attempt made to hide the hogs alleged to have been taken, or in any way whatever conceal the fact that the hogs were penned in daylight; they were kept publicly where they could be seen by anyone passing the place.

The testimony further discloses that it was an open range, where the hogs belonging to different parties ran at large. It is contended by the defendant, when he penned the hogs for Mr. Tomlinson, he believed they be-

longed to Mr. Tomlinson, and, when Mr. Tomlinson took them to market, he honestly believed they were his hogs. The gist of larceny is the intent at the time of the taking to deprive the owner of his property.

36 C. J. § 105, p. 764, says:

"If one in good faith takes the property of another believing it to be legally his own, or that he has the legal right to its possession, he is not guilty of larceny although his claim is based on a misconception of the law or his right under it. For although ignorance of law and honest intention cannot shield a man from civil liability for the trespass committed by him, yet they do protect him from criminal liability by divesting the act of the felonious intent, without which it cannot be a crime."

In Rugless v. State, 97 Ark. 152, 133 S. W. 600, the court said:

"The evidence for the state shows that the defendant took the horse in the presence of others under claim of title, and there is an absence of criminal intent, which must operate jointly with the act to constitute larceny."

In Griffin v. State, 87 Tex. Cr. R. 194, 220 S. W. 330, the court in the sixth paragraph of the syllabus says:

"One taking a hog from the range or commons, believing in good faith that it belonged to him, would not be guilty of theft."

The court, in Leak v. State (Tex. Cr. App.) 97 S. W. 476, in the first paragraph of the syllabus, says:

"Where defendant took a calf, erroneously believing it belonged to his employer, whose cattle he had charge of, and took it to his employer's farm, and there branded it * * * and afterwards sold it as his own, he was not guilty of theft, though before selling it he discovered his mistake. For him to be guilty, there must have been fraud in the original taking."

In Johnson v. U. S., 2 Okla. Cr. 16, 99 Pac. 1022, this court, in speaking through Judge Baker, reaffirmed the principle that, if the defendant took the property which he is charged with stealing, with the honest belief that he had the right or authority to do so, he would not be guilty of larceny, although he may have been mistaken.

In McSpadden v. Territory, 7 Okla. Cr. 228, 122 Pac. 1105, 1107, the court, in the body of the opinion said:

"They admitted the unlawful taking of the property, but claim it was taken by mistake, and not with intent to deprive the owner of his property; that when they became duly sober and discovered their mistake in taking the wrong bale of cotton they started to return with it, and would have returned the same that night, but they were arrested in the meantime. This was a proper and legitimate defense to the charge of larceny. No instruction was requested, and the court omitted to instruct the jury on this theory of the defense."

In Lockhart v. State, 10 Okla. Cr. 582, 139 Pac. 1156, 1158, the court reaffirmed the doctrine that, if the property alleged to have been stolen was taken by the defendant, honestly believing it to be his, there was no felonious intent.

In this case the court is of the opinion that the testimony is insufficient to sustain a conviction of the offense charged against the defendant. It appears from the testimony that the defendant penned the hogs alleged to have been stolen, in the daytime, in a pen at his home, where one who was passing might see them; that Mr. Blankenship was asked by the defendant to go and see if he recognized the hogs as being the hogs of Frank Tomlinson; that when Frank Tomlinson came home he thought he recognized them as being his hogs, and next morning Mr. Tomlinson loaded them in a wagon and traveled the public

highway, where they might be seen by any one, and where they were seen by other parties as he drove to town to sell them. The undisputed testimony is that the prosecuting witness had been marking his stock with the same mark of Frank Tomlinson, and that Tomlinson had been marking his stock for several years prior to the time the prosecuting witness began using the same mark that Tomlinson used. The testimony shows that the right ear of the hogs had been disfigured by cutting off a part of the ear. There was no concealment of the hogs, and defendant testified that he penned them, believing them to be the hogs of Frank Tomlinson. Tomlinson testified to loading them in the wagon, and taking them to town, and selling them, believing they were his hogs.

In Lockhart v. State, supra, in the body of the opinion this court said:

"Where the taking is open, in the presence of others, and there is no subsequent attempt to conceal the property, and no denial, and where possession is not obtained by force, trick, or stratagem, a strong presumption of fact arises that there was no felonious intent, which must be repelled by clear and convincing evidence before a jury may legitimately infer a felonious intent."

The evidence in this case is wholly insufficient to show the necessary elements of the offense charged. We therefore do not hesitate to say the judgment of conviction should be reversed.

For the reasons stated, the judgment is reversed.

EDWARDS, P. J., and CHAPPELL, J., concur.