BERT STANLEY v. STATE.

No. A-9215. May 28, 1937.
(69 Pac. [2d] 398.)

O. F. Mason, for plaintiff in error.

Mac Q. Williamson, Atty.˙ Gen., for the State.

DAVENPORT, P. J. The plaintiff in error, the defendant in the lower court, was by information charged with larceny of one black sow, weight about 260 pounds, marked with a swallow fork in the left ear and a split in the right ear, and five black and red spotted shoats which weighed about 40 pounds each, with no marks or brands, the property of Alvie Cunningham; was convicted and sentenced to serve a term of two years in the state penitentiary. Record was properly saved, and the defendant has appealed.

The state to maintain the charge against the defendant called as a witness Alvie Cunningham, who stated he lived in Ottawa county in the fall of 1934 and until January, 1935:

"I know Bert Stanley; he lived north and east of me something like a mile and a half; I know Hallie Lankford; he lives south and west of my place something like a mile or a mile and a half; early in January, 1935 I was the owner of a black sow that weighed about 250 pounds, and five shoats; the sow was marked with a swallow fork in the left and a split in the right ear; I had owned her for more than two years; the shoats, I imagine would weigh about forty pounds; they were running on the open range; the sow had been ranging down on Cow Skin, she would go back and forth; I got Mr. Maddux to go with me down there and hauled them home and kept them shut up for about three weeks and turned them out, and they would go off and stay maybe three or four days, maybe a week, and then come back and then disappear again.

"After they disappeared I went down to Mr. Hamas,' where she had been running in a wheat field and late corn field near the river; I went next to Mr. Lankford's, the sow had been there but was gone; I looked for my hogs but I did not find them. I went to Mr. Bert Stanley, the defendant, and told him I had come to demand my hogs, that I had found out he had my hogs and I wanted my money for them; he said he did not know they were my hogs or he wouldn't have gotten them; we talked a little while and Stanley said how much money, and I told him $22.50; he wanted to know how soon I had to have it and I told him Saturday; I suppose it was about Wednesday when I was talking to him; I went back to his place Saturday evening, but he was not there and I did not get to see him until after Mr. Dry went down with me and he was arrested. I do not know what hogs Mr. Stanley had prior to January; I saw some hogs there in his pen when I was at Mr. Stanley's house asking about my hogs but I do not know they were his.

384

"The last time I saw my hogs was a few days before Christmas 1934, down in the southeast part of Ottawa county, near Turkey Ford district. I live on the north side of the Delaware county line. It is rough country; the last time I saw them was down toward Mr. Hamas' place. I don't know how far Mr. Lankford's place is from Mr. Hamas' farm; there is quite a hilly country around there; it is a little over half a mile from Mr. Lankford's place to the Hamas farm; they are in Delaware county. The hogs had been gone from my place since two or three days before Christmas, 1934; I do not know how old the pigs were. I went down to Mr. Bert Stanley's, the defendant's, about the twentieth of January, I believe it was, wouldn't say for sure. My cousin Elmer Cunningham was with me. When we got to his home he was working on a Model T Ford; after we passed the time of day I told Bert I came to demand my money for the hogs; he said he didn't think they were my hogs or he wouldn't have taken them; I wouldn't say he stated they were his hogs; he agreed to pay me for them but he never talked about it any more; he went to a saw mill where his brother-in-law was working, and was working there when the sheriff went down and got him."

Hallie Lankford, testifying for the state, stated:

"My name is Hallie Lankford; I live a mile and a half west of the Turkey Ford store; I know Alvie Cunningham and Bert Stanley; I have seen Dewey McElheany a few times; in the early part of January 1935, I was living about five miles from Bert Stanley's place and about four miles across the hills from Alvie Cunningham; about a quarter of a mile in Delaware county; in an open hilly country; in the early part of January there was a black sow and five shoats around my place; the sow would weigh about 250 or 260 pounds; I couldn't say about the mark in the left ear; the pigs were black and red spotted and I judge would weigh about sixty or seventy pounds; they were around my place about a month or more. Bert Stanley came down and got them. Dewey McElheany was with him; I could not say just what time in January

it was went they got them; they were in a Ford Roadster, T model, they put them in the turtle back of the roadster; Bert Stanley was driving the car. Stanley told me he came down one time and I was not there, and he could not get hold of the hogs; he left word for me something about if he could not get hold of them for me to butcher them and he would give me half of them. I was working during the day, and would come home in the dark, leaving by daylight; I told him if he would come down I would help him catch them; I was not acquainted with Stanley at the time; he first came down and talked with me a short while before Christmas, 1934; these hogs had been running around my place for something like a month, and running down in the low bottom near my house most of the time; the Hamas place is something like three or four miles from my place; the Cunningham place is something like three or four miles right over the hills, to go around the road to get to his place I expect would be twelve or fourteen miles. Stanley lived on the road going around to the Cunningham place a little over half way; traveling back from the Cunningham house along the road to the Stanley house is something like four or five miles. I don't know how many times Stanley was down inquiring for the hogs; he came and got the sow once and she came back. I helped him load her one time; Stanley came down one morning about daylight as I was starting to work, and my nephew helped him load her that time; Stanley told me they were his hogs and asked me to help butcher them; he asked me whether or not they were damaging me, and I told him there would be no damage if he could get them and take them away. Stanley got the hogs after Christmas; the sow was fat and the pigs were just in fair shape."

Dewey McElheany, testifying for the state, stated:

"I am acquainted with Bert Stanley; at the time of the alleged crime I was living about 200 yards south of him, and about a half mile from Alvie Cunningham; I went with Bert Stanley to Hallie Lankford's place after some hogs some time in January; Stanley said he had a sow and four or five shoats; he said he would give me half

the hogs if I would help him butcher them; we first went down on Sunday night, and the hogs were not up and we did not get them; we went back early Monday morning, the hogs were there and we loaded the sow in the turtle back of the car and took her to Stanley's place and butchered her; we went back later and got four of the shoats, and hauled them in the same car we hauled the sow in; we put them in a pen and they got out and we went back later in the week and got them; I would say the sow would weigh around 175 to 200 pounds. Russell Cunningham, who is a cousin of Alvie Cunningham, Charley Frost, and one of my brothers came down to Stanley's while we were butchering. Joe McElheany and Elbert Martin was also there. Bert McCarkell helped us load the sow in the car; Mr. Lankford was not there, he had gone to work."

Russell Cunningham, called as a witness, stated:

"I am a cousin of Alvie Cunningham; I lived in the same neighborhood with Alvie last January, near Bert Stanley's; I was at Bert's place in January when they was doing some butchering; I do not remember the date; when I got there Dewey and Bert were fixing to kill a black sow, I judge she would weigh about 240 or 250 pounds."

Elmer Cunningham stated:

"I am a cousin of Alvie Cunningham; I knew Bert Stanley; I went with Alvie to Stanley's house to see about some hogs some time in January, 1935; Alvie asked him what he was going to do about the hogs; Stanley said, 'Alvie, if I had known these were your hogs, I would not have taken them'; Alvie told him he wanted pay for his hogs—'If you do, there will be nothing further said about it; if you don't, I will have to turn you over to the law.'

"Bert asked him how long he could wait for the money, and he said Saturday; and Alvie said, 'I will be back here Saturday afternoon between four and five o'clock'; I live near Alvie and know he had some hogs at that time, but I do not know how many; he had a black sow. I am a cousin of Russell Cunningham."

Joe McElheany, testifying, in substance stated:

"I know Bert Stanley; I went to my brother Dewey's place on Monday and saw them butchering; Dewey, Elbert Martin and Russell Cunningham was at Stanley's place when I got there."

The foregoing is the substance of the state's testimony.

The defendant, testifying in his own behalf, stated:

"My family consists of myself and wife; I live at Turkey Ford, have lived in and around there since 1900; I got these hogs I am charged with stealing from Mrs. Cora Dameron to raise on the halves; I took them home and put them in a pen, one of them got out; the black sow ran off and I found her down at Hallie Lankford's; I made five or six trips to get them; she was marked split in each ear; she would weigh, I guess, about 250 pounds; when I located the sow Dewey McElheany went with me to help me get them, I as not able to lift very much; we made two trips to get the hogs; we took the sow to my place and butchered her that morning; at the time we butchered her Dewey McElheany, Russell Cunningham, Elbert Martin, and I believe Joe McElheany were there; we got four of the shoats after we got the sow, and butchered them. At the time I had a listed sow and four shoats I got from Mrs. Dameron; they came and got the listed sow and hogs after I butchered. I have always used the mark of a split in each ear. The difference in a swallow fork and split is in a swallow fork you cut out a big hunk of the ear.

"Mr. Cunningham came to my house and talked to me about having some hogs missing; I advised him I had not killed his hogs, and he said I did, and if I did not pay him for them he would have me arrested; I told him I could not help it; I don't remember whether he fixed a definite date he should be paid, but I told him I was paying another party for them. I never did agree to pay him for the hogs; at the time he should have come back on

Saturday I was working at a saw-mill between Grove and Jay, at Perry's place; he was my brother-in-law; I did not run when the sheriff came down to arrest me; I told Mr. Cunningham if I had known they were his hogs I would not have taken them."

On cross-examination witness stated the hogs that were butchered were his:

"I got the sow from Mrs. Cora Dameron who lives out on Tar creek, to raise on the halves, in October, 1934; in the bunch was a belted sow and four shoats and this sow; she had pigs about a week after I got her; I hauled the hogs from Mrs. Dameron's in a pick-up; I taken the hogs down from Mrs. Dameron's and penned them for a while; the black sow got out and brought pigs and I never got her back; I did not see her again until I got her down at Mr. Lankford's; I do not know what age the pigs were, they were running with her and were black and red; they were not marked; I sold one of the belted pigs to Lee James; Mrs. Cora Dameron is my cousin; I did not agree to pay Mr. Cunningham $22.50 for the sow and shoats I had butchered, nor did I tell him had I known they were his hogs I would not have taken them; I told him they were my hogs, and that the sow belonged to Mrs. Dameron, and I had a right to do what I wanted to with them.

"The saw-mill was at my brother-in-law's place where I was working about 20 miles from my home, I judge. I was acquainted with Ely Dry, the sheriff of Ottawa county at that time; I was out in the woods cutting timber."

Cora Dameron, testifying in behalf of the defendant, stated:

"I live on N Street, S. E., of Miami, Okla.; have lived there four years; I know Bert Stanley; he and I had a deal with some hogs; there was six of them, four shoats and two sows; one of the sows was a white belted sow, and the other black. I judge the shoats would weigh about 30 or 40 pounds; the pigs belonged to the listed sow; Stanley was raising them on the halves; I never got anything

out of them, but my son did; I don't know exactly how many he did get. Stanley killed some of them, I told him that was all right, half of them were his."

On cross-examination witness stated she was a first cousin of Stanley:

"I raised these hogs from little pigs, did not own the mothers, I got the pigs from Bub Ward; I did not mark them and told Mr. Stanley he could mark them; I intended in the division to let Mr. Stanley keep one of the sows. My son now lives in Colorado; his name is Noah Tanner; he was living with me at the time I let Mr. Stanley have the hogs; he afterwards moved to Big Cabin; I don't know what my son did with them; I have never seen them since."

Elbert Martin, testifying for the defendant, stated:

"I live southeast of Fairland; am acquainted with Mr. Stanley; have known him 25 years; in January, 1935, he lived in about 300 yards of me; I know Elmer Cunningham; Alvie Cunningham lived northeast of me about a mile and a half; I don't know just when he left; I was at Mr. Stanley's when they were getting ready to butcher; Bert Stanley, Dewey McElheany, and a boy called Sandy Cunningham, Russell Cunningham, and probably Dewey McElheany, my brother, were there; they had the water hot and were getting ready to butcher when I walked up; they killed the sow with a butcher knife by sticking her. Mr. Alvie Cunningham had a bunch of spotted hogs; there was nothing about these hogs that caused me to think they were Cunningham's hogs; I did not think she was Alvie's sow; his stock was a kind of a mixed up spotted hogs; I had lived there and observed them for about two years; I paid no attention to the marks on the sow and I don't remember Mr. Cunningham's mark, I think it was a swallow fork in the right and a split in the left ear. I remained at Stanley's until after they got done butchering and got Bert to take me to the store; I was not there at any time when they butchered any pigs; Alvie Cunningham had quite a few hogs and I can't figure out which ones were gone."

Bert Markell, testifying for the state, stated:

"I live one mile west of Turkey Ford; been living there two years the 16th of January; I know Mr. Cunningham and also Mr. Stanley; some time about Christmas Stanley came over looking for some hogs; he came about three times; I told him there was a black sow there; he described the hogs he was inquiring about and I gave him some information; I helped get the hogs into the barn lot down at Uncle Hallie Lankford's; there was a black sow and five pigs; Stanley claimed these hogs were his, I don't know whose they were; I lived within a half mile of my uncle Hallie Lankford's at the time; I had not seen Mr. Stanley or Mr. Cunningham down there looking for hogs prior to that time."

The foregoing is the substance of the testimony of both the state and the defendant upon the question of the larceny of the hogs.

The defendant in his petition in error has assigned eight errors alleged to have been committed in the trial of his case, the first, second, fourth, fifth, and eighth errors being as follows:

"1. Error of the court in overruling the motion for a new trial.

"2. Errors of the court in the decisions of questions of law arising during the trial.

"4. Error of the court in not sustaining his demurrer to the evidence of the state.

"5. Error of the court in submitting the cause to the jury.

"8. The judgment is not supported by sufficient evidence, and is contrary to the law and the evidence."

The only question for this court to determine is the question of the testimony, that is, under the testimony

as shown by the record, is it sufficient to sustain a charge of larceny?

Section 2253, O. S. 1931 (21 Okla. St. Ann. § 1701), defines larceny as follows:

"Larceny is the taking of personal property accomplished by fraud or stealth, and with intent to deprive another thereof."

Section 2255, O. S. 1931 (21 Okla. St. Ann. § 1703), reads as follows:

"Larceny is divided into two degrees; the first of which is termed grand larceny, the second petit larceny."

Section 2256, O. S. 1931 (21 Okla. St. Ann. § 1704), defines grand larceny as larceny in either of the following cases:

"1. When the property taken is of value exceeding $20.

"2. When such property, although not of value exceeding twenty dollars in value, is taken from the person of another.' '

Section 2267, O. S. 1931 (21 Okla. St. Ann. § 1716), in part provides:

"And any person in this state who shall steal any cow or hog shall be guilty of a felony and upon conviction shall be punished by confinement in the state penitentiary for a term of not less than two (2) years, nor more than ten years."

The evidence clearly shows that the defendant in this case claimed the hogs butchered to be his, and that he had a right to butcher them. He went to his neighbor's home where the hogs were ranging but could not find them, later the hogs came to the neighbor's and he penned them in his barn, and the defendant who had previous to the

time of getting the sow had been down and inquired about the hogs. A neighbor went with him and helped load the sow in the car, and traveled with him to his home where the sow was butchered in the presence of a number of the neighbors of the defendant, who were going back and forth while the butchering was being done. The defendant later got four of the shoats and butchered them. The proof further shows that they were butchered near the highway in front of the defendant's house.

There is not a word in the testimony of the state indicating any effort was made on the part of the defendant to conceal the hogs or the butchering of them. All of the testimony shows that the hogs were caught at his neighbor's place in daylight without any attempt to deceive or conceal what was being done with the hogs.

The defendant in his testimony states positively he had a right to butcher the hogs, and that he did not butcher any of the prosecuting witness' hogs to his knowledge. All of the testimony goes to the fact that the defendant either butchered his own hogs or believed he was butchering his own hogs, and if they belonged to Alvie Cunningham, the defendant was honestly mistaken. This question has been passed on by this court and by the courts of the different states. In Rugless v. State, 97 Ark. 152, 133 S. W. 600, the court said:

"The evidence for the state shows that the defendant took the horse in the presence of others under claim of title, and there is an absence of criminal intent, which must operate jointly with the act to constitute the larceny."

This court, in Sneed v. State, 61 Okla. Cr. 96, 65 Pac. (2d) 1245, in the second paragraph of the syllabus, said:

"Penal Code, § 2267 (21 Okla. St. Ann. § 1716), providing that 'any person in this state who shall steal any cow or hog shall be guilty of a felony and upon conviction shall be punished by confinement in the state penitentiary for a term of not less than two years, nor more than ten years,' creates a separate and distinct offense from section 2253 (21 Okla. St. Ann. § 1701) defining larceny to be 'the taking of personal property, accomplished by fraud or stealth, and with intent to deprive another thereof,' and does not make the stealing of the animals named grand larceny, without regard to value. To support a conviction under section 2267, it is necessary to prove a felonious intent on the part of the taker to deprive the owner thereof and to convert the same to his, the taker's own use, which specific proof is not necessary to support a conviction under the general larceny statute."

In Linde v. State, 61 Okla. Cr. 136, 66 Pac. (2d) 527, 528, this court in discussing the testimony in the body of the opinion said:

"The taking of the turkeys was in the daytime, with knowledge of others that they had been taken. The defendant at no time did anything to conceal the fact that he had taken them. He assisted the prosecuting witness in examining them and she at no time made demand for their return to her as her property.

"It was the contention of the defendant in his evidence that the turkeys belonged to him and were his property at the time they were taken. Many neighbors testified to his good character and reputation in the community where he had resided. There was some testimony as to his having a bad reputation, but this was mostly from those with whom he had had some kind of controversy.

"From the reading of this record, we cannot but come to the conclusion that it does not show any criminal intent on the part of the defendant to commit the crime of larceny."

In Lansdale v. State, 45 Okla. Cr. 123, 282 Pac. 170, 175, this court said:

"36 C. J. § 105, p. 764, says: 'If one in good faith takes the property of another believing it to be legally his own, or that he has the legal right to its possession he is not guilty of larceny although his claim is based on a misconception of the law or his right under it. For although ignorance of law and honest intention cannot shield a man from civil liability for the trespass committed by him, yet they do protect him from criminal liability by divesting the act of the felonious intent, without which it cannot be a crime.'"

In Griffin v. State, 87 Tex. Cr. R. 194, 220 S. W. 330, the court in the sixth paragraph of the syllabus says:

"One taking a hog from the range or commons believing in good faith that it belonged to him would not be guilty of theft."

The court, in Leak v. State (Tex. Cr. App.) 97 S. W. 476, in the first paragraph of the syllabus, says:

"Where defendant took a calf, erroneously believing it belonged to his employer, whose cattle he had charge of, and took it to his employer's farm, and there branded it * * * and afterwards sold it as his own, he was not guilty of theft, though before selling it he discovered his mistake. For him to be guilty, there must have been fraud in the original taking."

In Johnson v. United States, 2 Okla. Cr. 16, 99 Pac. 1022, this court, speaking through Judge Baker, reaffirmed the principle that, if the defendant took the property which he is charged with stealing, with the honest belief that he had the right or authority to do so, he would not be guilty of larceny, although he may have been mistaken.

In McSpadden v. Territory, 7 Okla. Cr. 228, 122 Pac. 1105, 1107, the court in the body of the opinion said:

"They admitted the unlawful taking of the property, but claim that it was taken by mistake, and not with intent to deprive the owner of his property; that when they became duly sober and discovered their mistake in taking the wrong bale of cotton they started to return with it, and would have returned the same that night, but they were arrested in the meantime. This was a proper and legitimate defense to the charge of larceny. No instruction was requested, and the court omitted to instruct the jury on this theory of the defense."

In Lockhart v. State, 10 Okla. Cr. 582, 139 Pac. 1156, 1158, the court reaffirmed the doctrine that, if the property alleged to have been stolen by the defendant was taken, honestly, believing it to be his, there was no felonious intent.

The court is of the opinion that the testimony is insufficient to sustain a conviction of the offense charged against the defendant, as it appears from the undisputed testimony that the defendant got the hogs at his neighbors who had penned them for him, and another neighbor had helped load the hogs; he took them home in his car in the daytime and in the presence of his neighbors in the community butchered them within a few feet of the public highway. The defendant stated positively that he got these hogs from Mrs. Cora Dameron, and she corroborated the defendant.

It has been held universally by the courts, not only in this state but in other states, that where the taking is open and in the presence of friends, and there is no subsequent attempt to conceal the property, and no denial, and where possession is not obtained by force, trickery, or stratagem, a strict presumption of fact arises that there was no felonious intent which must be rebutted by clear and convincing evidence before a jury may legitimately infer a felonious intent.

The evidence in this case is wholly insufficient to show the necessary elements of the offense charged. We therefore do not hesitate to say the judgment of conviction should be reversed.

For the reasons stated, the judgment is reversed.

DOYLE and BAREFOOT, JJ., concur.