No. 36,299

· THE STATE OF KANSAS, *Appellee,* v. CHARLES GOLDSBERRY, *Appellant.*

(160 P. 2d 690)

Opinion filed July 7, 1945.

*Payne H. Ratner, Donald C. Allen, H. L. Mattox,* all of Wichita, and *W. C. Gould,* of Dodge City, were on the briefs for the appellant.

*A. B. Mitchell,* attorney general, *Leon W. Lundblade,* assistant attorney general, *John Etling,* of Kinsley, and *O. A. Wilson,* county attorney, were on the briefs for the appellee.

The opinion of the court was delivered by

BURCH, J.: The defendant was convicted of grand larceny for having taken cattle in violation of G. S. 1935, 21-533. The principal question raised by the appeal is whether there was sufficient evidence to prove felonious intent on the part of the defendant.

A summary of the evidence introduced by the state follows: A fence separated two pastures. In one of them the complaining wit-

ness, Herbert Olson, had about 64 head of cattle; in the other the defendant was pasturing about 140 head of cattle. On November 30, 1943, shortly after noon, Herbert Olson drove into his field with a truck and saw therein a man on horseback driving a bunch of cattle. He drove until he reached the wire fence, stopped his truck and ran over to where the cattle were being driven. At such time he saw John Hessman; also the defendant; the defendant's brother, John Goldsberry; and John's young son. Hessman was coming down the fence driving a steer which Herbert Olson testified belonged to him. When Olson saw Hessman he asked him what he was doing, and Hessman replied, "We are after our cattle." Olson said, "That is not your cattle," and scared the steer back. An argument followed. Hessman and Olson went over to where the defendant was driving 12 or 13 cattle, all of which Olson testified were his. The defendant was driving a sedan. Olson got in front of the cattle and hollered with the result that the cattle scattered and ran away toward the northwest. The defendant drove the sedan rapidly toward Olson, who side-stepped the car. The defendant turned the car around and came back and drove it again immediately toward Olson, who again got out of the way. The defendant stopped the car and he and Olson started talking. Olson asked the defendant what he thought he was going to do and he replied that he would take the cattle down to Hessman's and shear them. Olson protested but the defendant instructed the men to get the cattle and started to leave. Olson yelled at the defendant; he stopped and the two of them had a further talk. Olson got on the running board of the car and rode with the defendant down to the gate and another argument occurred as to the ownership of the cattle. In the course of the argument Olson offered to bet $100 that the cattle belonged to him and the defendant offered to bet $1,000 that they belonged to the defendant. Olson did not take the bet, he said, because he did not have that much money. The brother of the defendant took three steers and went west to where he met his boy who was driving the other cattle. Olson again tried to head them off and again the defendant drove the car directly toward Olson but stopped before he got to him. Hessman got out of the car and approached Olson with a knife and said, "Stay away from them cattle." Olson started away and Hessman got in the car. The defendant, Goldsberry, jumped out of the car, called Olson a profane name and when about eight feet away from Olson pulled out a gun. Hess-

man told the defendant to shoot Olson, whereupon Olson ran. He went home and got his car. Later that day he saw the men herein named driving eight or nine head toward Hessman's place. Olson and three other men went back to the field where the altercations occurred and examined the tracks made by the cattle. The tracks went down by the electric one-wire fence half a mile south to the loading docks of Hessman's place, where the defendant had told Olson he was going to take them. Olson counted his cattle the evening of the same day and there were three steers and four heifers missing. He testified that the defendant's cattle were branded with "JH" and that his cattle were branded with a bar followed by "O" on the left neck. At the time of the alleged larceny Olson's brands had been on the cattle a year except in the case of the heifers which had been branded about ten months. The heifers had been branded previously on their left hips but when Olson purchased them he put his own brand on them with acid. The steers also had other brands on them.

Two days after the taking of the cattle Olson went to the Dodge City stockyards where he found three steers and two heifers in a pen by themselves. With them was a little roan which had been with the herd when it was being driven from Olson's field. Olson had with him the sheriff and the undersheriff and two other witnesses. They took the cattle into the chutes and sheared all of them except the little roan. The shearing disclosed some identification marks on the left hips of the heifers and one heifer had a dim "O" on the left neck. The other one was scarred some on the neck. Olson testified, however, that he could discern an "O" Bar on the neck but it wasn't too plain. He testified that when he branded the heifers their hair was long and that he used cold acid which would not burn a brand as plainly as hot acid. Olson testified that on the three steers he found his brands on their left necks and that he found other identifying brands on their left hips and that they were his cattle. While the parties hereinbefore named were shearing the cattle the defendant appeared and Olson asked him how he liked the looks of the brands. Olson also asked him, "What is your brand?" but the defendant did not say anything. Olson then said, "Now don't you wish you hadn't pulled that gun," and the defendant said, ". . . if it had been a gun, you couldn't have run fast enough." During this conversation Goldsberry was in a position to see the brands on the cattle after they had been sheared.

On cross-examination by way of explanation Olson testified that the two herds of cattle had been on adjoining pastures, separated only by an electric one-wire fence, for about six weeks. He also admitted that he had talked to John Goldsberry about getting a stray steer out of Olson's herd but denied that he talked to him about getting any more of the defendant's cattle out of the herd and he denied making any arrangements with John Goldsberry to go with him to see if any of the defendant's cattle were in Olson's herd. He testified further that Hessman had not threatened to cut him with a knife and that he was not afraid of Hessman and that Hessman did not strike him. Olson admitted that when the defendant told him he was going to take the cattle down to Hessman's and shear them he stated as follows: "No, you are not, we will take them to Andy Carlson's." According to Olson it was his thought that the defendant and those accompanying him were going to take the cattle and shear them to see what the brands were. At such time Olson did not tell the defendant where Olson's brand would be found on the cattle. He admitted that the brands on his heifers were very indistinct; he further admitted that it was a custom among cattle men when cattle got mixed up with other people's cattle for the owners to go over and inspect the herds of other people to see if any of their cattle were in the other herds and that he had done so himself.

John Schean was called as a witness for the state and testified that he had sold calves to Olson and that they had Colorado ranch brands on them of various kinds and descriptions; that he saw the cattle in the pen at the Dodge City stockyards and that he noticed a "UD" brand on one heifer but that he did not attempt to see whether the cattle were some of the same ones which he had sold to Olson in February. He further testified that he was not able to see whether there were any brands on the necks of the cattle which he saw at the stockyards; that all he saw on the necks looked like little marks and didn't show up.

Ed Maskus, who was present at the shearing in the stockyards, testified that after the cattle were sheared various marks were visible on them. He was asked, "Was there any evidence of any brand on the left neck of the heifers?" and replied, "It was rough, that is all I could say." He stated the defendant Goldsberry was ten or fifteen feet away while the shearing was going on and was not invited over to help with the shearing or look at the results. He further testified as follows: "We couldn't and didn't see the 'O' Bar before they were sheared."

Two other witnesses testified as to what marks they saw on the cattle after they were sheared and one of them testified that an acid brand put on in the winter doesn't show much through long hair and that lots of times it never gets through to show at all.

Walter Smith testified in behalf of the state that he was a yard foreman employed by the Winters Livestock Commission Company and that six head of cattle were delivered to such company by Albert Horton on behalf of the defendant in November, 1943, for the purpose of having them sheared. He testified that the cattle remained in the sales pavilion for a little over a month and were eventually sold by the defendant. On cross-examination, in further explanation of the sale, he stated that at the time they were sold he knew that there had been a replevin action brought by Olson to recover possession of them and that the defendant had filed a redelivery bond in the replevin action. He further stated that he understood the cattle were brought to the yard to be sheared for the purpose of determining the ownership of the cattle and that the defendant had so advised him by stating "there was a little misunderstanding about the cattle and he (the defendant) wanted to shear them to see who they belonged to." He was asked, "Told you to hold them until they determined the ownership?" and answered, "That is right." On cross-examination he enlarged upon the conversation with the defendant and stated that the defendant had said, "There is a question about who they belong to. If the cattle don't belong to me and belong to Mr. Olson, I will load them in a truck and take them back."

D. J. Bowie, who was the sheriff of Hodgeman county, testified that he examined the tracks in the field from which the cattle had been taken but couldn't tell too much about them. He further testified that he went to the Dodge City sales pavilion and inquired for the cattle the defendant had brought in and was directed to a pen where there were six head—three large steers, one smaller steer, and two white-faced heifers. The five biggest ones were driven into a chute and sheared. After the shearing he was able to identify certain brands on their hips and was able to make out a very poor brand in the middle of a Circle Bar on the neck of one of the cattle and that one of them did not have a readable brand although there was some roughness that might be the signs of a brand. He stated that when the shearing occurred the defendant came down and that the witness in the presence of the undersheriff, John Lighter, had a

conversation with the defendant. His testimony is as follows: ". . . We asked him if he claimed these cattle and he said he did. We asked him about the brands, but he didn't have any mark on them he could show us." John Lighter, the undersheriff, gave testimony as to the marks disclosed by the shearing, which did not differ materially from evidence previously herein referred to.

A stipulation was filed in the case to the effect that at the time of the trial a replevin action also was pending in the district court of Ford county, Kansas, in which action Herbert Olson was the plaintiff and Charles Goldsberry was the defendant. The stipulation sets forth that the replevin action was brought to recover possession of three white-faced steers and two white-faced heifers, the same being the cattle referred to in the case at bar; that the aforesaid cattle had been taken into possession by the sheriff under the writ of replevin; that the defendant later gave a redelivery bond; and that upon the giving of such bond the cattle were redelivered to the defendant. E. W. Nickels testified that the cattle were sold by the Winters Livestock Commission Company of Dodge City for Mr. Goldsberry on December 16, 1943.

At the conclusion of the foregoing testimony the defendant demurred to the evidence and moved to be discharged for the reason that the evidence failed to establish a prima facie case of violation of any law of the state of Kansas. The information sets forth that on the 30th day of November, 1943, the defendant, Charles Goldsberry, and John Hessman did then and there unlawfully, feloniously, and wilfully, take, steal and carry away, of the property of Herbert Olson three short two-year-old steers branded "O" Bar on left neck valued at $77 each and one short two-year-old heifer branded "UD" on left hip valued at $77, and also one short two-year-old heifer branded Bar "W" on left hip, valued at $77, with the intent to convert the same to their own use and deprive the owner thereof. The record does not disclose the result of the case against John Hessman but the defendant, Charles Goldsberry, was convicted and sentenced to the penitentiary to serve from one to seven years. We are not concerned for the present with the defendant's evidence. Consideration must be given primarily to the question of whether the demurrer and motion to discharge the defendant should have been sustained.

Counsel for the state contend that there was substantial evidence, even though some of it may have been circumstantial, to warrant

submission of the case to the jury and that the jury was justified in finding felonious intent on the part of the defendant. In support of such contentions they cite *State v. Wood,* 145 Kan. 730, 67 P. 2d 544; *State v. Smith,* 158 Kan. 645, 149 P. 2d 600; and *State v. Thomas,* 155 Kan. 374, 125 P. 2d 375, from which case the following is quoted:

"It is not the function of appellate courts, which have not had the opportunity afforded in the trial court of noting the demeanor of witnesses and otherwise passing upon their credibility, to weigh conflicting evidence. Upon appeal from conviction in a criminal action the evidence must be viewed in the light most favorable to the state, and the verdict will not be disturbed if there was substantial evidence, even though entirely circumstantial, as a basis for a reasonable inference of guilt." (p. 375.)

In reply to the appellant's contention that there was no substantial evidence to prove felonious intent, appellee argues in substance as follows: That the circumstances do not disclose a peaceable call on a neighbor to obtain permission to go upon his premises to search for missing cattle but a bold daylight raid upon his herd during the noon hour, carried out by a force of men sufficient to overcome any opposition, if detected, and which, if the complaining witness had not appeared on the scene as he did, might have resulted in disappearance of cattle. Appellee stresses that the appellant employed sufficient force to overcome any resistance on the part of the witness Olson and that appellant actually took the cattle with knowledge that they were being taken against the will of the man in whose possession they were under a claim of ownership. It is further contended that the defendant's saying that he wanted to take the cattle to Hessman's to shear them was merely an empty promise not made in good faith as evidenced by his failure to shear them and causing them to be removed immediately from the place where he told the complaining witness they would be taken. Appellee also emphasizes the fact that after the taking of the cattle occurred the defendant was indifferent as to the result of the examination made for identifying marks and failed to call attention to any brand on the cattle which might have assisted in determining the ownership. Appellee also asserts that the statement made by the defendant to the effect that he would immediately haul the cattle back in case they were not his was mere idle talk and that defendant's failure to actually haul them back demonstrated such fact. The appellee advances further arguments, but nearly all of such additional arguments are based upon discrepancies appearing in the tes-

timony offered in behalf of the defendant and with which we are not presently concerned.

The appellant insists that the only reasonable conclusion which can be drawn from the testimony offered in behalf of the state is that the defendant and the complaining witness had a dispute over the ownership of the cattle and that the defendant took them for the purpose of identification with full knowledge on the part of the complaining witness. Appellant insists that there was no evidence indicating that at the date of the alleged crime the defendant intended to take the cattle permanently; that all of the evidence and circumstances are consistent with the theory that the cattle were taken for the purpose of identification and that the complaining witness' own testimony affirmatively shows that the cattle were being taken for such purpose. In support of such assertion appellant points out that the prosecuting witness admits that the defendant wanted to take them down to Hessman's place for the purpose of identifying them and that the prosecuting witness wanted them taken to another place owned by Andy Carlson. Appellant also insists that the testimony introduced by the state to the effect that the defendant informed the foreman of the Winters Livestock Commission Company that the six head of cattle were to be held for inspection to determine their ownership and that the defendant would take the cattle back to Mr. Olson in case they proved to be his cattle conclusively shows that when the cattle were taken, to wit: November 30, 1943, the defendant did not then intend to deprive the true owner permanently of possession of the cattle. There is merit in such contentions and reference to decisions must follow.

Counsel for appellant cite the case of *State v. Shepherd*, 63 Kan. 545, 66 Pac. 236, the second paragraph of the syllabus of which reads as follows:

"The term felonious intent, as used in relation to larceny, 'means to deprive the owner, not temporarily, but permanently, of his property, without color of right or lawful excuse for the act, and to convert it to the taker's use without the consent of the owner.' (*In re Mutchler, Petitioner*, 55 Kan. 164, 40 Pac. 283.)"

The opinion in such case reads as follows:

"The guilt or innocence of appellants depends on the presence or absence of a felonious intent in their minds at any time while in the possession of the saddle to deprive the owner permanently of his property and convert it to their own use. As was said by Chief Justice Horton, in *In re Mutchler, Petitioner*, 55 Kan. 164, 40 Pac. 283: 'A felonious intent means to deprive the

owner, not temporarily, but permanently, of his own property, without color of right or excuse for the act, and to convert it to the taker's use without the consent of the owner.' (See, also, *Schultz v. The State,* 30 Tex. App. 94, 16 S. W. 756; *Mitchell et al. v. The Territory of Oklahoma,* 7 Okla. 527, 54 Pac. 782; *People v. Brown,* 105 Cal. 66, 38 Pac. 518.)" (p. 547.)

As before stated, the state contends that the jury was entitled to draw inferences in part from circumstantial evidence. Let us look at the law applicable to circumstantial evidence in criminal cases. It differs materially from the rule in civil cases. A recent statement of it will be found in the case of *State v. Robinson,* 158 Kan. 287, 147 P. 2d 374. From the opinion by Mr. Justice Smith the following is quoted:

"The defendant relies on the rule stated by this court many times that in order to sustain a conviction the circumstances must be so strong that they exclude every reasonable hypothesis except that of the guilt of the defendant.

"In *State v. Sweizewski,* 73 Kan. 733, 85 Pac. 800, we said: 'The circumstances must be so·strong as not only to be consistent with the theory of the defendant's guilt, but they must also exclude every reasonable hypothesis except that of the guilt of the defendant. The facts above relied upon do not exclude every reasonable hypothesis save that of the defendant's guilt, but do suggest that the defendant for numerous reasons may be entirely innocent.' (p. 734.) see, also, *State v. Brizendine,* 114 Kan. 699, 220 Pac. 174; *State v. Hunter,* 50 Kan. 302, 32 Pac. 37; *State v. Murphy,* 145 Kan. 242, 65 P. 2d 342, and *State v. Morton,* 91 Kan. 908, 139 Pac. 409." (p. 288.)

A general statement of the law applicable to the question raised by the appeal will be found in 32 Am. Jur. 936, § 41, which reads as follows:

"An intent to steal property and a bona fide claim of right to take it are incompatible. One who takes property in good faith, under fair color of claim or title, honestly believing that he is its owner and has a right to its possession or that he has a right to take it, is not guilty of larceny even though he is mistaken in such belief, since in such case the felonious intent is lacking. This is true even though the property thus taken is ultimately lost through the taker's negligence, or even though the taker may subsequently, as on discovering that he was mistaken, convert the property to his own use. The fact that the taker employs force or a trick to obtain what he thinks he owns or has a right to take does not necessarily alter the rule. A fortiori, if one takes his own property, no felonious intent can be predicated with respect to such act; . . ."

Application of the foregoing principles to the present case causes us to be concerned with the following observations: It is at least rather unusual for a man who intends to commit larceny to take with him two other men and his brother's young son, an automobile

and a horse, and in broad daylight drive out to a clearly visible position in an open field. Such circumstances would certainly be compatible with an intent on the part of the man to obtain his own property rather than to steal another's. According to the record, the first words spoken by either of the original defendants were, "We are after our cattle." At that time the defendant and those associated with him had rounded up 12 or 13 cattle. An argument took place over who owned the cattle but when the defendant left the field only six or seven were taken. It should be noted that of the six which finally reached the stockyards the controversy as to ownership continued as to only five. It is evident that the complaining witness must have been satisfied that the little roan calf actually belonged to the defendant. That an argument in good faith took place between the complaining witness and the defendant as to the proper ownership of the cattle was admitted by the complaining witness and otherwise there would have been no occasion for his testimony to the effect that he offered to bet $100 that the cattle were his and the defendant offered to bet $1,000 that the cattle belonged to him. If the defendant was intending at the time to make a permanent theft of the cattle regardless of their true ownership, there would have been no occasion for him to have advised the complaining witness that he was taking them to John Hessman's place for the purpose of having them sheared; likewise, there would have been no occasion for the complaining witness to have suggested that the cattle be taken to Andy Carlson's place instead of John Hessman's for the same purpose. One of the most convincing elements supporting the contention of the defendant as to the intent of the defendant arises by reason of the complaining witness' statement reading as follows: "They were going to shear them to see where the brands were." It must follow that fair presumptions can be predicated upon such evidence to the effect that the complaining witness had succeeded in retaining approximately fifty percent of the cattle originally in question, by reason of his claim of ownership, and that he understood that the remaining 6 or 7 cattle were being taken for the purpose of having them sheared in order to identify them either as his cattle or otherwise. Such hypothesis is as reasonable as any suggested by counsel for the state and it can be said with certainty that it is not excluded by circumstantial evidence. It is true, as the state contends, that the defendant did not leave the cattle very long at John Hessman's and that the actual shearing did not

take place there, but they were taken to Hessman's place according to the evidence introduced by the state. Again, it must be observed that it is most unusual for a man who intends to commit a theft to advise the owner of the property where the property will be taken. Such a circumstance is not compatible with concealment and intent to deprive the owner of property without any color of right. The state's testimony clearly discloses that the markings on the cattle were so obscure as to necessitate the shearing in order to determine to whom they belonged. Another very impressing circumstance showing the intent of the defendant was developed by the testimony of the state when its witness, Walter Smith, testified, without contradiction, that the defendant stated at the time he placed the six cattle in the stockyards, as follows: "There is a question about who they belong to. If the cattle don't belong to me and belong to Mr. Olson, I will load them in a truck and take them back." The defendant had ordered them placed in a separate pen for the purpose of having them identified. The state insists that such circumstances demonstrated mere idle talk. Such insistences may be justified but can it be said beyond a reasonable doubt that such directions and explanations were not indicative of a lack of criminal intent on the part of the defendant to deprive permanently the true owner of the cattle of their possession? Again, it seems quite reasonable to infer good faith from such circumstances rather than bad faith. The state meets such an argument, however, by calling attention to the fact that the shearing disclosed the cattle belonged to the complaining witness—a fact which the defendant did not admit even at the stockyards—and that the defendant did not in fact return them to Olson but regardless of their ownership caused them to be sold. Such is true but before the cattle were sold the complaining witness had sued the defendant in a replevin action and the defendant had furnished a redelivery bond. There is nothing in the present case to indicate any effort on the part of the defendant to conceal the cattle so that they could not have been examined again and again to the entire satisfaction of the complaining witness long before they were sold after the replevin action had been instituted. Appellant's giving of the redelivery bond was consistent with his claim of ownership and it is difficult to see anything in such circumstances indicative of criminal intent.

The state vigorously contends that the fact the defendant used and was accompanied by too much force in connection with the tak-

ing of the cattle from the field; that his attempts to run into the complaining witness with a car; the fact that he had a gun; and that his co-defendant had a knife in his hand, all created a strong inference that he intended to take the property regardless of the claimed ownership by the complaining witness. Do such circumstances, however, necessarily lead to the conclusion that it was the defendant's intent to take another's property rather than his own? The use of force when accompanied by a color of right or lawful excuse for the act is not in and of itself sufficient to prove the criminal intent incident to larceny. The fact that the party taking the property may have been mistaken in his claim to ownership does not alter the rule provided he honestly believed that the property belonged to him. On this point, in addition to the text hereinbefore cited, see the case of *Rugless v. State*, 97 Ark. 152, 133 S. W. 600, from which the following is quoted:

"The testimony on the part of the state shows that the taking was accompanied by means of putting Holmes in fear, . . . 'Where, in an indictment for robbery, it appeared in evidence that the taking of the property by the defendant was violent, but done in the presence of others under a claim of title, *held*, that such taking did not constitute the crime of robbery.' *Brown v. State*, 28 Ark. 126. The evidence for the state shows that the defendant took the horse in the presence of others under claim of title, and there is an absence of criminal intent, which must operate jointly with the act to constitute larceny." (p. 153.)

This opinion would be prolonged unnecessarily by further discussion of each and every contention advanced by the respective parties. It is sufficient to say that, after carefully reviewing all of the evidence introduced on behalf of the state and giving the state the benefit of every favorable inference which can be deduced therefrom, the court is of the opinion that such evidence and the circumstances were insufficient, as a matter of law, to prove felonious intent on the part of the defendant and that the demurrer and the motion to discharge the defendant should have been sustained.

Parties interested in the general question raised by the appeal may find aid by referring to the following incomplete list of rather recent cases, which in substance sustain the conclusion herein reached: *Baugh v. State*, 200 Ind. 585, 165 N. E. 434; *People v. Slayton*, 123 Mich. 397, 82 N. W. 205; *People v. Shaunding*, 268 Mich. 218, 255 N. W. 770; *Lechner v. Ebenreiter*, 235 Wis. 244, 292 N. W. 913; *State v. Pullen* (Del.), 3 Penn. 184, 50 Atl. 538; *Sisson v. State*, 16 Ariz. 170, 141 Pac. 713; *Linde v. State*, 61 Okla. Crim. 136,

66 P. 2d 527; *Stanley v. State,* 61 Okla. Crim. 382, 69 P. 2d 398; *Griffin v. The State,* 87 Tex. Crim. Rep., 194, 220 S. W. 330; *Galloway v. State,* 105 Miss. 897, 63 So. 313; and also see *State v. Lowe,* 67 Kan. 183, 72 Pac. 524.

The trial court sustained the conviction of the defendant. The judgment of the trial court is reversed with directions to discharge the defendant.

HARVEY, C. J., and THIELE, J., dissent.