Nos. 45,745 to 45,752, Incl.—Consolidated

STATE OF KANSAS, *Appellee*, v. VERNON S. PIERCE, RICHARD ALEXANDER, HENRY DAVIS, NOEL D. NEWSOM, FRED M. JOHNSON, JOHN H. MANNING, LEONARD HARRISON, and SAMUEL JARVIS HUNT, *Appellants*.

(490 P. 2d 584)

Opinion filed November 6, 1971.

*Chester I. Lewis*, of Wichita, and *Charles Scott*, of Topeka, argued the cause and were on the briefs for the appellants.

*Keith Sanborn*, county attorney, argued the cause, and *Vern Miller*, attorney general, and *Stephen M. Joseph*, county attorney legal intern, were with him on the brief for the appellee.

The opinion of the court was delivered by

HARMAN, C.: This appeal arises from convictions by a jury of Vernon S. Pierce, Richard Alexander, Henry Davis, Noel D. Newsom, Fred M. Johnson, John H. Manning, Leonard Harrison and Samuel Jarvis Hunt of varying degrees of robbery.

By way of background we may state that as a result of certain events occurring at a Wichita motel on October 17, 1968, appellants and Harold Cole were charged with certain criminal offenses. All nine persons were initially charged with two counts of kidnapping, one count of conspiracy to kidnap, two counts of extortion and two counts of assault with intent to commit extortion, the alleged victims of these offenses being Frank Carpenter and Jaddy Blake. During the preliminary examination upon these charges, two additional ones were added—one count of robbery in the first degree and one count of extortion—the alleged victims of the added charges being Andrew P. Gutierrez and William P. Howard. At the conclusion of the preliminary hearing the examining magistrate dismissed the three kidnapping counts and held all defendants for trial in district court upon the remaining six counts. The state then filed an information in district court accordingly, charging the

defendants jointly. In advance of trial the district court quashed the two counts of assault to commit extortion and upon the state's appeal this ruling was upheld (*State v. Pierce, et al.*, 205 Kan. 433, 469 P. 2d 308).

Trial by jury was eventually had upon the remaining four counts, resulting in complete acquittal of defendant Harold Cole and acquittal of the eight appellants upon all except the robbery charge. Alexander, Davis, Newsom, Johnson, Manning and Harrison were convicted of robbery in the first degree; Pierce and Hunt were convicted of the lesser included offense of robbery in the third degree. Statutory sentences were imposed and this appeal ensued.

Appellants' specifications of error will be dealt with in the order in which they have been presented and briefed on appeal.

The first contention is the evidence was insufficient to sustain the verdicts of guilty, which issue was appropriately raised at trial. The evidence relied upon by the state for conviction will be briefly related with further evidentiary matters to be mentioned later in connection with alleged trial errors.

Joint Action in Community Services (JACS) is a private non-profit corporation organized by a group of leaders of religious social agencies to operate on a nationwide scale. It was formed in response to a call for aid by the Office of Economic Opportunity in administering the "poverty program". JACS's primary function was to assist disadvantaged boys, aged sixteen through twenty-one, who had dropped out of school and were unemployed, to obtain training, skill and eventual employment through enrollment in a subordinate OEO program known as the Job Corps.

The complaining witness as to the offenses upon which appellants were convicted, Andrew P. Gutierrez, was the director of JACS's North Central Region. This area comprised the state of Kansas and nine other midwestern and western states, with regional headquarters at Kansas City, Missouri. William P. Howard was deputy regional director of JACS. Gutierrez had previously served as a Presbyterian minister for five years in Wichita. He and Howard began their task of Job Corps recruitment by contacting various public and private agencies in Kansas and elsewhere in the region. The Kansas quota for Job Corps recruits was 300. On October 4 and 5, 1968, Gutierrez and his staff conducted a general orientation meeting at a hotel in Kansas City, Missouri, the purpose of which was to explain goals and function of JACS

and to enlist as volunteers a broad spectrum of persons in the region. All the appellants except Johnson were invited to attend this meeting where it was stated recruitment of youth into the Job Corps was to be done on a voluntary basis, that is, recruiters working for JACS below management level were to be nonsalaried but would be compensated for expenses on a scale of five to sixteen dollars per day. At the conclusion of this conference Leonard Harrison and one Frank Reaves from Wichita met further with Gutierrez respecting the recruitment program, Harrison indicating he thought his group of associates could help. Harrison suggested that Gutierrez contact appellant Johnson who, evidently through inadvertence, had not been invited to attend the conference. Harrison stated the JACS plan to use volunteers to recruit and screen boys for Job Corps would not be successful and any recruitment would have to be channeled through him and his associates; that storefront centers located in Kansas City, Wichita, Topeka and Lawrence managed and staffed by his group would be needed to meet the recruitment quota for Kansas.

On Monday, October 7, 1968, Gutierrez met with Johnson at JACS's office in Kansas City, Missouri. Johnson gave Gutierrez a written list of the names of persons with whom he was associated to be invited to a subsequent meeting, the purpose of which was to consider implementation of the plans discussed at the orentation meeting. Gutierrez suggested Kansas City as the logical site for this meeting inasmuch as many of the persons listed by Johnson resided in that area. Johnson replied Kansas City was not acceptable and the meeting would have to be held at Wichita. Gutierrez assented and agreed to pay for air transportation for the group and to reserve a conference room at the Holiday Inn Midtown at Wichita, the meeting to be held Thursday, October 17, 1968. Deputy director Howard procured the necessary airline reservations for the party, including himself and Gutierrez, with departure from the Kansas City airport scheduled for 7:00 a. m. on October 17 and return to Kansas City at 4:00 p. m. the same day. The next day after these arrangements had been made, Johnson inquired about meals for the conference participants, which Gutierrez agreed to provide. Johnson also stated his group would require overnight accommodations in Wichita as they had other matters to attend to there. Gutierrez agreed to provide this item. No other agreement or

understanding concerning the conference was made and nothing was said about payment of wages or consultation fees.

On the morning of October 17, 1968, Gutierrez and Howard arrived first at the Kansas City airport, then Johnson, Pierce, Alexander, Davis and Newsom arrived. Some of the latter group, including Davis, Newsom and Johnson were wearing an unusual type of garb. They were clothed in a military type dress—olive green army fatigue trousers with combat boots, web belts and headpieces resembling an Australian bush hat. Pierce wore a business suit. As host for the conferring group Gutierrez extended his hand in greeting. Appellants who were present did not acknowledge the greeting but put their hands behind their backs and walked away. Harrison and Hunt arrived just before the plane left. Some of appellants were wearing African type dashiki blouses. After boarding the plane Johnson and his group sat apart from Gutierrez and Howard. Upon arriving in Wichita Gutierrez rented two cars in which to drive himself, Howard and the seven appellants arriving on the plane, to the Holiday Inn Midtown. These appellants remained cold and aloof to Gutierrez during the trip to the motel. Upon arrival each appellant was registered in a separate room. Johnson indicated he and his group desired first to have a conference of their own. About 10:00 a. m. Gutierrez and Howard entered the conference room and shortly thereafter the nine persons who were named as defendants arrived. These included appellant Manning and also Harold Cole, both of whom lived in the Wichita area. All of this group, except Newsom, were employed in some supervisory capacity in what is commonly known as the war on poverty. Newsom was employed by a Kansas City power company in its apprenticeship program. Pierce was director of a multi-service neighborhood center; Alexander and Davis were co-operators in a minority business enterprise; Johnson, among other activities, was an associate director in charge of OEO neighborhood services; Manning was a neighborhood center coordinator; Harrison was director of the Ballard Center, a children's community center at Lawrence; and Hunt directed a neighborhood house of a group called Organization of Citizen Representation in Topeka. The latter two are private organizations.

Prior to the start of the meeting several appellants conducted a thorough search of the conference room, including minute inspection of the furniture and wall tapestries, as well as an adjoining kitchen-

etto area, ostensibly for bugging devices. Four appellants who were dressed in the military type uniform then posted themselves as guards at the closed doors, standing in a military "parade rest" position. A girl named Glenda Rice was present at the meeting for a few minutes but was asked by appellants to leave the room and did so. Appellants who were present had been referred to Gutierrez by one of his aides as the Black Guard.

Gutierrez then outlined the purpose of JACS and his proposal for utilizing volunteers in recruiting boys for the Job Corps. Appellants told Gutierrez and Howard their proposal was completely unacceptable. Appellants insisted upon a program involving store-front locations in Kansas City, Wichita, Topeka and Lawrence, to be staffed and managed by Johnson and his group. Appellants demanded $6,000 to $6,500 per month to finance their recruiting operations, saying if JACS did not cooperate it would not recruit any boys in Kansas, that JACS had to work with appellants in any recruiting or "forget it". Gutierrez explained that JACS could only pay expenses up to $16.00 per day for each boy recruited and could not pay more than $450.00 for a store-front operation. At one point in the discussion one appellant stated that if they were going to get anywhere, they had to have a drink. Gutierrez and Howard then mentioned buying a bottle or two of liquor but appellants made it clear each wanted a bottle; appellants passed around among themselves a sheet of paper upon which each listed the brand name of the bottle of liquor he wanted; appellants were then showing hostility and Gutierrez sent Howard to a liquor store where he purchased the bottles and returned with them for distribution. When Gutierrez stated he could not agree to appellants' demands as to pay, one appellant stated they were not dealing with the right man, that they must deal with the "plantation owner", meaning B. J. Roberts, JACS's national director, to whom reference had been made. During this time the uniformed appellants were guarding the doors and from time to time appellants Newsom and Davis pounded their fists into the palms of their other hands and also removed their web belts and slapped them across the palms of their hands. Johnson, Harrison and Hunt were the principal spokesmen for the group.

At noon the conference adjourned during which time Gutierrez called Mr. Roberts in Washington, D. C. to report appellants' proposal which Roberts rejected. Gutierrez was highly emotional and

nervous during the telephone conversation. Later in the afternoon the conference between Gutierrez and Howard and appellants resumed, Gutierrez reporting that after conferring with Roberts he was unable to accept appellants' proposal. Gutierrez explained Roberts would be in Des Moines, Iowa, the next day for a conference where appellants could see him if they desired. He stated he would call Roberts upon his return to Kansas City and would notify appellants if Roberts would meet them in Des Moines.

Around 3:00 p. m., the afternoon session having proven fruitless after further discussion, Gutierrez and Howard concluded the conference and prepared to leave. As they got up appellant Alexander approached Gutierrez and Howard with his fist clenched and in a very menacing manner stated he had taken the day off from work and he demanded pay for his wages "now or else"; Gutierrez replied there had been no agreement for paying anything like that; Alexander said, "I'll beat hell out of you if I don't get my day's wages" and also stated to Gutierrez and Howard he could "take" both singlehandedly and beat them up. He also stated "I get very angry when I don't get what I want". At this point Gutierrez felt fearful for his life. Johnson led Alexander out of the room and upon returning stated to Gutierrez and Howard, "Now, you see we mean business". Johnson and Harrison demanded consultation fees. Again a sheet of paper was passed around by appellants and each listed thereon the amount of wages or consultation fee he wanted, and the statement was made, "We want our money now". Gutierrez and Howard explained they could not pay consultation fees or wages; Gutierrez testified one appellant said in a threatening manner that "he would demand these wages and consultation fees before we left the room". In a "high angry" manner one said he was going to get his money one way or another. Periodically some of appellants stood close to Gutierrez and Howard and rhythmically pounded their fists into their open palms and slapped their palms with their web belts, so there was a "constant clap". The door was guarded and some appellants stood behind Gutierrez and Howard. Although none of appellants touched either Gutierrez or Howard, Gutierrez was very frightened and he directed Howard to write checks to appellants for the amounts listed. Howard wrote out the checks for the amounts demanded, Gutierrez then scribbled his signature on them and both were permitted to leave. The checks were made out separately to each of the appellants and also to Harold Cole, Glenda

Rice and Frank Reaves, although the latter three were not present during the afternoon session. Glenda Rice had been in the room only a few minutes. These checks totaled $1,062.70 and were written on Gutierrez's individual bank account. They constitute the property which was the subject of the robbery charge of which appellants stand convicted.

Upon his return to Kansas City Gutierrez informed Mr. Roberts, JACS's national director, by telephone of appellant's demands; Roberts rejected their request for a meeting at Des Moines; Gutierrez and his aides attempted then to inform Johnson and his group by telephone not to come to Des Moines, but because of noise in the motel rooms were unable to get their message through.

On the next morning, Friday, October 18, 1968, Harrison, Hunt, Manning and Glenda Rice came into Gutierrez's office at Kansas City, Missouri. When Gutierrez told the group there was to be no Des Moines meeting and that he had attempted to so inform them the night before, each again demanded wages or consultation fees for that day. The Rice girl was again asked to leave, and after further threats of violence, Gutierrez, being fearful, instructed Howard to write checks as demanded. Harrison, Manning and Hunt then left to cash their checks but soon returned saying the bank would not honor the checks. Meanwhile Johnson had arrived and all demanded wages and consultation fees. Gutierrez then arranged with Howard to borrow $720.00 from the latter's bank account with which to deposit and make good the checks which were again written as demanded. Several of the checks were cashed. On October 21, 1968, Gutierrez called the F. B. I. and on October 22, 1968, he stopped payment on the remaining uncashed checks.

Manning, Johnson and Cole testified on behalf of appellants, generally denying the testimony of Gutierrez and Howard as to hostility and threats of violence. Johnson testified Gutierrez agreed to pay consultation fees. Other witnesses testified in support of appellants and their previous good records and reputations. The evidence further showed appellants also negotiated separately and privately on October 17, 1968, at the Wichita motel with a Utah group whose mission was to render the same type of service to the Job Corps program as JACS. The Utah group was not related to JACS in any way. It offered $40.00 for each boy recruited.

Appellants acknowledge the rule this court does not weigh con-

flicting evidence or determine credibility of witnesses but is limited to determining whether there is substantial competent evidence to support the jury's finding of guilt. They rely for their contention of insufficiency of evidence solely on a rule of law applied in *State v. Goldsberry,* 160 Kan. 138, 160 P. 2d 690. There two individuals were pasturing cattle upon property separated by a fence. After a dispute between the two as to ownership of certain cattle one attempted by force to take those claimed by him. This court stated:

"An intent to steal property and a *bona fide* claim of the right to take it are incompatible. One who takes property in good faith under fair color of claim of title, believing that he is its owner and has the right to its possession or that he has a right to take it, is not guilty of larceny even though he is mistaken in such belief.

"The fact that the taker employs force to obtain possession of what he believes is his own property under color of right to possession thereof is not in and of itself sufficient to prove the felonious intent incident to larceny." (Syl. ¶¶ 3 and 4.)

Appellants contend that by reason of the foregoing there was no showing of felonious intent. The thrust of their argument is that a bona fide claim of title and felonious intent are incompatible and therefore the evidence was insufficient to rebut the defense that appellants took the checks under a bona fide claim of title. Closely allied with this contention appellants complain of the trial court's refusal to give an instruction to the jury embodying the rules quoted from *Goldsberry.* We cannot agree with appellants' contentions.

One compelling factual distinction exists between *Goldsberry* and the case at bar. The former involved a claim to certain and specific property, namely, several head of cattle. Here no claim of title to any specific property was invoked by appellants. Rather the purported claim was to an inchoate undetermined amount of money allegedly owed, to satisfy which appellants took property to which they could trace no claim of title. Although there is authority to the contrary (see anno. 46 A. L. R. 2d 1227), we believe the better rule, grounded on both law and public policy, is that the violent taking of property from the person of another by force or intimidation for the purpose of applying it to payment of an alleged debt constitutes the offense of robbery where the taker has no bona fide claim of title or right to the possession of the particular property. After elaborate review of conflicting precedents, some of the reasons for this rule

were cogently stated in *Moyers v. State*, 186 Ga. 446, 197 S. E. 846, 116 A. L. R. 981, as follows:

"[The majority rule] also overlooks the fact that the creditor has no title or right of possession of the money or property of the debtor. The better authority seems to be that the taking of money or property from the person of another by force or intimidation, without the consent of the owner, to apply to the payment of a debt due to the taker, would constitute the offense of robbery. [pp. 450-451.]

. . . . . . . . . . . . .

"The law prescribes the rule of conduct, commands obedience, frowns upon disobedience. Vengeance is mine sayeth the law. While it justifies self-defense, and self-defense means prevention, it does not favor the taking of the law in one's own hand. It does not permit one to resort to violence, save in defense of person, habitation, or property. It would not be wise to permit the citizen to use violence to redress his wrongs. What right has any one to take the law in his own hands, and in order to enforce his demands to commit serious acts of violence and disturbance of the peace against another or his property or habitation, and then, when apprehended, to appeal to the law to acquit him of his wrong? Is it not the saner rule of law to let every one high or low, rich or poor, weak or strong, be alike amenable to the law? [pp. 453-454.]

. . . . . . . . . . . . .

"The law favors the creditor in the collection of his debts, but by no stretch of law can it give him, without trial, title or the right to possession of the property of the debtor. Debt is a hard master and often gets its subjects in serious and difficult situations; yet it does not alone transfer to the creditor the title or right of possession of the property of the debtor. The debtor is entitled, under the law, to hold his property against the creditor until it is subjected to his debt by due process of law." (p. 455.)

In *Edwards v. State*, 49 Wis. 2d 105, 181 N. W. 2d 383, the court refined the issue thus:

"Neither can we accept the view of the majority cases which see no distinction between the reclaiming of one's own property by force and the taking of money by force from a debtor to repay a debt which is presently owing. We think the intent to steal is present when one at gunpoint or by force secures specific money which does not belong to him in order to apply it by such self-help to a debt owed to him. . . . Unless the accused can trace his ownership to specific coins and bills in the possession of the debtor, the debtor is the owner of the money in his pocket and it is theft to take it from his possession with intention to permanently deprive him of its possession regardless of what other motive or intention the accused has.

"The distinction between specific personal property and money in general is important. A debtor can owe another $150 but the $150 in the debtor's pocket is not the specific property of the creditor. One has the intention to steal when he takes money from another's possession against the possessor's consent even though he also intends to apply the stolen money to a debt. The efficacy of self-help by force to enforce a bona fide claim for money does not negate the

intent to commit robbery. Can one break into a bank and take money so long as he does not take more than the balance in his savings or checking account? Under the majority rule the accused must make change to be sure he collects no more than the amount he believes is due him on the debt. A debt is a relationship and in respect to money seldom finds itself embedded in specific coins and currency of the realm. Consequently, taking money from a debtor by force to pay a debt is robbery. The creditor has no such right of appropriation and allocation." (pp. 113-114.)

Robbery in the first degree (K. S. A. 21-527, since repealed) is the felonious taking of the property of another from his person or in his presence, and against his will, by violence to his person or by putting him in fear of some immediate injury to his person, while robbery in the third degree (K. S. A. 21-529, since repealed) includes an element of extortion through verbal communication (*State v. Jones,* 187 Kan. 496, 357 P. 2d 760). Here the evidence for the prosecution showed no agreement, either express or implied, to pay appellants wages or consultation fees or anything beyond transportation, lodging and meals. A calculated atmosphere of hostility and fear was created by appellants acting in concert. Menaces and threats of violence with definite show of force were used when Gutierrez and Howard attempted to leave. Gutierrez testified that at the time the checks were executed and delivered at the Wichita motel he was frightened and fearful of physical harm to himself and his assistant. This testimony was amply supported by that of Howard. Hence we hold the trial court erred neither in submitting the cause for jury determination nor in refusing to give the requested instruction.

Appellants make complaint of the trial court's refusal to give two further instructions to the jury respecting felonious intent. Our examination of the entire instructions given reveals they fairly and adequately defined for the jury the offenses of which appellants were convicted, including the requisite element of felonious intent.

Appellants contend the trial court erroneously and prejudicially admitted evidence concerning membership of certain appellants in an organization known as the Black Guard. Upon direct examination as a part of the case in chief for the state a Wichita police officer testified that on October 24, 1968, defendant Harold Cole had stated in an interview that the men in uniform at the time of the incident on October 17 were members of the Black Guard. Appellants now advance no objection to this evidence on the ground of irrelevancy and indeed we think it was relevant on the prosecu-

tion's theory the action taken by appellants on October 17 was in the nature of concerted or group action. If relevant, the evidence was admissible unless otherwise barred by statute (K. S. A. 60-407).

Appellants argue the evidence should have been excluded because the statement was made after any alleged conspiracy had ceased and it should have been excluded because it tended to show the commission of other offenses in violation of K. S. A. 60-455, the other offenses being joining a revolutionary society (K. S. A. 21-203) and criminal syndicalism (K. S. A. 21-301). First of all, our examination of the record discloses no objection on these grounds made at trial, and for lack of contemporaneous objection this omission might well end the matter (K. S. A. 60-404). There was objection to the testimony respecting Cole's statement on the lack of proper Miranda warning but no complaint is now made on that score. Beyond this, however, once relevancy is conceded it matters not that the challenged evidence may show commission of another crime. In *State v. Crowe*, 207 Kan. 473, 486 P. 2d 503, this court said:

"Evidence otherwise relevant in a criminal prosecution is not rendered inadmissible because it may show another or greater crime than that charged." (Syl.¬ ¶ 1.)

A similar complaint is lodged against certain testimony of a Mr. Barton that while serving in Vietnam he had observed uniforms similar to those worn by appellants upon the occasion in question but here again the record reveals no contemporaneous objection to the evidence now challenged.

Appellants also complain of instruction No. 16 given by the trial court which in effect told the jury that appellants were not charged with any offense arising out of the execution of checks on October 18, 1968, in Kansas City, Missouri, and such evidence was admitted and should be considered solely on the issue of appellant's credibility. The record clearly reveals appellants specifically requested this instruction. Their counsel now advise this request was withdrawn. Resort to the transcript leaves the matter doubtful at best as to just what did occur with respect to the request. In any event we think the evidence was relevant on the issue of guilt (appellants do not now contend otherwise although they did object to reception of the evidence at trial) and any error in the limiting instruction inured against the state rather than appellants.

Appellants complain as to certain questions propounded to a

defense character witness upon the state's cross-examination. The questions encompassed purported misconduct on the part of appellant Johnson to whose good reputation the witness had attested upon direct examination. Appellants argue the alleged instances of misconduct were never shown to be true and in fact were false. Here again the record is unclear as to the making of contemporaneous objection to the questions asked, but we think no error occurred. The questions to the witness respecting instances of misconduct were prefaced in proper form, that is "Had you heard", etc. (see *State v. Hinton,* 206 Kan. 500, 479 P. 2d 910). More importantly, the record affirmatively reveals the prosecuting attorney was acting in good faith in propounding the questions asked, as shown by his subsequent rebuttal use of two Kansas City, Kansas, police officers in an attempt, albeit unsuccessful, to establish the truth of the purported facts, and by the inclusion in the record of a memo addressed to the county attorney from a high ranking police officer indicating the truth of the assumed matters. The examination complained of was within permissible limits (*State v. Hinton,* supra) while the subsequent rebuttal testimony actually bolstered the good reputation put in issue.

Appellants urge error in the admission of certain rebuttal evidence as to the payment of consultant fees to appellant Johnson and to a statement made by one appellant in December, 1968, immediately following the preliminary hearing. The payment of such fees as a matter of custom became an issue as to Johnson following his testimony, because of the nature of his job, and was a proper subject for impeachment upon rebuttal rather than a collateral issue. A more serious question is the admission in rebuttal of a woman's testimony concerning statements in her presence by one of several appellants present in an elevator in the courthouse immediately after the preliminary examination, as follows:

". . . and one of the defendants said, 'What about that little Mex? I was just beginning to like that little Mex.' And one of the defendants turned and said, 'What that little Mex needs was to have his throat slit.'"

The witness was unable to identify which appellants made these statements other than to say neither Mr. Hunt nor Mr. Harrison was on the elevator. At trial it was shown the complaining witness, Mr. Gutierrez, was of Mexican-American extraction. The making of this statement scarcely constitutes a fact showing a consciousness of guilt so as to render it admissible and we are of opinion it was

erroneous to have permitted it into evidence. However, the statement on its face amounts to no more than sheer after-the-fact hyperbole, which any juror would recognize and treat accordingly. The testimony should not have been allowed but we do not believe its reception could have had prejudicial effect upon appellants' substantial rights.

Upon rebuttal the prosecution, over objection, introduced the testimony of two Philadelphia police officers concerning the existence and structure of an organization known as the Black Guard, described as a secret component of an organization known as Revolutionary Action Movement (RAM), to all of which appellants renew their objection as not proper rebuttal and prejudicial. The officers described the presence of the Black Guard at a Black Power convention in Philadelphia in September, 1968, whose members wore uniforms similar to those worn by some of the appellants on October 17, 1968, in Wichita. It had previously been shown that five of the appellants attended that convention. Testimony concerning the Black Guard developed in this manner: The first reference came upon appellants' cross-examination of Gutierrez when the latter testified without objection that Johnson and the group named by him had been referred to by one of his aides as the Black Guard. The next reference was in the testimony of the Wichita police officer concerning defendant Cole's pretrial statement that the uniformed persons were members of the Black Guard, which testimony, as already mentioned, came into the case without objection. Also unobjected to was testimony by two girls that at Wichita on the night of October 17 Frank Carpenter, an alleged victim of the charge of extortion upon which appellants were subsequently acquitted, was in a beaten and dazed condition, vomiting, clutching his stomach and complaining of pain, and Carpenter stated that at the Holiday Inn he had been beaten and kicked repeatedly in the stomach by the Black Guard, mentioning several appellants by name. Appellants Johnson and Manning testified upon their direct examination they were knowledgeable as to black movements and there was no such thing as a Black Guard; that it was an organization invented by the Wichita police and county attorney, being a product of their imagination. In this posture we think the testimony was not improperly received in rebuttal. As already indicated, evidence concerning the Black Guard and appellants' connection therewith had probative value as tending to show appellants acted jointly on

October 17 as a concerted group with a common purpose. Being relevant, the evidence cannot be deemed prejudicial, and it did rebut appellants' testimony that the Black Guard was only a figment of the prosecuting officers' imagination. The exact order of proof has always been held to lie in the sound discretion of the trial court and absent abuse of that discretion there is no ground for reversal.

Appellants at trial made timely motion prior to submission of the case to the jury to require the prosecution to elect between the counts of robbery and extortion. This request was denied, which ruling is assigned as error. The trial court did specifically instruct the jury it could not find appellants guilty of both robbery and extortion and the jury's verdict was consistent with the direction. The rule appears to be that where a motion to elect is denied, the rights of the accused are protected by an instruction to the jury that a conviction may be had only on one count and not both (5 Wharton's Criminal Law and Procedure, [Anderson ed.] § 1940). Our decisions are in accord with this rule (*State v. Taylor*, 90 Kan. 438, 133 Pac. 861; *State v. McManaman*, 175 Kan. 33, 258 P. 2d 997) and we find nothing prejudicial in the procedure employed.

Appellants assert error in the trial court's failure to quash the robbery count because the checks in question were not property within the definition of a particular statute, K. S. A. 62-1503, which provided:

"Where the indictment or information charges an offense against the property of another by robbery, theft, fraud, embezzlement, or the like, the jury upon conviction shall ascertain and declare in their verdict the value of the property taken, embezzled or received, and the amount *restored*, if any, and the value thereof; but their failure to do so shall in no wise affect the validity of their verdict." (Our emphasis.)

Appellants' sole argument is this: Some of the checks written at Wichita were surrendered to Gutierrez at Kansas City, Missouri, the next day, in return for which Gutierrez wrote new checks incorporating the amount of the Wichita checks; hence the Kansas City checks constituted a *restoring* within the meaning of 62-1503, and because this *restoration* occurred in Missouri there is no jurisdiction in Kansas for the offense. We think this interpretation is so patently fallacious that further analysis of 62-1503 is unwarranted. Checks are a form of tangible personalty capable of possession within the meaning of our crimes act and hence are subject to the offense of robbery. K. S. A. 21-129 provided:

"The term 'personal property' as used in this act shall be construed to mean goods, chattels, effects, evidences of right in action, and all written instruments by which any pecuniary obligation, or any right or title to property, real or personal, shall be created, acknowledged, assigned, transferred, increased, defeated, discharged, or dismissed."

By definition a check is a negotiable instrument and therefore creates a pecuniary obligation upon the maker and renders to the payee an unconditional promise to pay a sum certain in money which is a benefit to the payee (K. S. A. 84-3-104). Although the common law rule was otherwise on the theory the coercive execution of a written instrument rendered it void *ab initio* and therefore a thing of no value, the modern rule appears to be that under statutes such as ours checks may be the subject of felonious acquisition (see 2 Wharton's Criminal Law and Procedure [Anderson ed.], § 491, pp. 158-159, and cases therein cited).

We have examined other complaints in derogation of the conviction, including an alleged illegal search and seizure of certain articles of clothing and uniforms and final arguments of the prosecution wherein allegedly racism was injected, but find nothing to warrant disturbing the judgment and it is affirmed.

APPROVED BY THE COURT.

FROMME, J., dissenting. The findings of this jury convicting six defendants of first degree robbery and two defendants of extortion (robbery in the third degree) are irreconcilably in conflict and should not be permitted to stand.

All defendants were charged in count three of the information with conspiring to commit and committing in concert the crime proscribed by K. S. A. 21-527 (first degree robbery). All took part in the single episode which gave rise to the charges and all obtained checks from the victim by means of intimidation while acting in concert.

The distinguishing feature between extortion and robbery lies in the state of mind of the victim when the felonious act occurs. In 2 Wharton's Criminal Law and Procedure, § 547, p. 246, the author points out extortion is distinguished from robbery by the fact the property is obtained with the consent of the possessor, whereas robbery demands it be taken against the will and without the consent of its possessor. (See *People v. Anderson*, 59 Cal. App. 408, 211 Pac. 254; *People v. Kruper*, 340 Mich. 114, 64 N. W. 2d 629 and *State v. Casto*, 120 Wash. 557, 207 Pac. 952.)

In the crime of murder the degree may depend upon the minds of the perpetrators and separate defendants may be guilty of different degrees but not so in the case of robbery where the degree of the crime depends upon the state of mind of a single victim.

The principal victim in this case, Andrew P. Gutierrez, could have had but a single state of mind when he signed and delivered the checks to these defendants. Either the checks were all obtained without his consent or they were all obtained with his consent. The jury could not logically find in this case that both states of mind existed and that he did not consent as to six of the defendants and did consent as to two.

In *State v. Pierce, et al.*, 205 Kan. 433, 469 P. 2d 308, we pointed out:

". . . The completed crime commonly known as extortion under our present code is actually that denounced in K. S. A. 21-529 . . ." (p. 435.)

It was under an information charging violation of K. S. A. 21-527 that the defendants, Pierce and Hunt, were found guilty by the jury and sentenced for the lesser included offense, extortion, as defined in K. S. A. 21-529.

Consent is obtained in an extortion through intimidation and an overbearing of will so that the victim chooses to consent with the understanding that thus he is to save himself or others from some personal calamity or injury. In *People v. Peck*, 43 Cal. App. 638, 185 Pac. 881, this is explained as follows:

". . . In a legal sense, in a case of this kind, money or property is obtained from a person with his consent if he with apparent willingness gives it to the party obtaining it with the understanding that thus he is to save himself from some personal calamity or injury, notwithstanding that within himself he may still protest against the circumstances requiring him to dispose of his money in that way or for such a purpose. . . ." (p. 645.)

The defendants in the court below asked that the state be required to elect whether it was relying for conviction on first degree robbery or extortion. In *State v. Pierce, et al.*, supra, we said:

"An accusatory pleading in a criminal case may, in order to meet the exigency of proof, charge the commission of the same offense in different ways. In such a situation a conviction can generally be upheld only on one count, the function of the added counts in the pleading being to anticipate and obviate fatal variance between allegations and proof. Thus it is proper to charge by several counts of an information the same offense committed in different ways or by different means to the extent necessary to provide for every possible contingency in the evidence. . . ." (205 Kan. 433, p. 436.)

In *State v. Gauger*, 200 Kan. 515, 438 P. 2d 455, it was held:

"Where a single act of violence or intimidation, which is an essential element of a first degree robbery conviction, is also relied on as constituting the separate crime of assault with intent to rob, two separate offenses cannot be carved out of the one criminal delinquency." (Syl. § 5.)

In the present case all defendants were accused of conspiring together to commit and committing in concert the crime of robbery in the first degree. A single act of intimidation participated in by all defendants occurred against a single victim. The victim could have had but one state of mind. He either consented or he did not. Two separate offenses cannot be carved out of the one criminal delinquency.

The confusion of the jury in arriving at these conflicting findings which resulted in different verdicts was caused by the instructions of the trial court to which objection was lodged. The instructions set forth count three (robbery in the first degree) under which all eight defendants were found guilty. Six were found guilty of first degree robbery. Two were found guilty under count three of extortion.

Instruction No. 12 reads:

"Count Three of the Information in this case charges the defendants with the crime of Robbery in the First Degree under Section 21-527 of the Statutes of Kansas Annotated. This charge includes not only the charge of Robbery in the First Degree but the offense of Robbery in the Third Degree as defined in Section 21-529 of the Statutes of Kansas Annotated.

"After hearing the evidence, the instructions of the Court and argument of Counsel, and after deliberating upon the case, you determine that one, some or all of the defendants are guilty of robbery but have a reasonable doubt as to which degree—first or third—one, some or all of the defendants are guilty of, in that event the conviction may be only of the lower degree."

However, the jury was charged under Instruction No. 3 as follows:

"You are further instructed that each count of the Information charges a separate and distinct offense from the offenses charged in the other counts. In determining the guilt or innocence of the defendants upon each one of the offenses charged you must treat and consider it separately from the offenses charged in the other counts.

"In other words, as to Count One of the Information you may, under the instructions herein given, find one, some or all of the defendants guilty or not guilty of the charge contained in said count. As to Count Two of the Information, you may find one, some or all of the defendants guilty or not guilty of the charge contained in said count. *In regard to Count Three and Count Four of the Information,* as filed by the plaintiff, *you are instructed that you cannot find any of the defendants guilty of both Count Three and Count Four,*

*but that you may find one, some or all of the defendants guilty or not guilty of the charge contained in Count Three, or you may find one, some or all of the defendants guilty or not guilty of the charge contained in Count Four."* (Emphasis added.)

Count four which is referred to in the above instruction was the charge of blackmail-extortion under K. S. A. 21-2412. It was defined in Instruction No. 9 as follows:

"Blackmail; Whoever verbally demand of any person, with menaces, any chattel, money or valuable security, or to do an injury to the person or property of any person, with intent to extort or gain from such person any chattel, money, or valuable security, or any pecuniary advantage whatsoever, or with intent to compel the person threatened to do any act against his will, with the intent aforesaid, shall be guilty of a felony. . . ."

This was followed by Instruction No. 11 which defined extortion or third degree robbery under K. S. A. 21-529 as follows:

"If any person shall verbally threaten to do any injury to the person or property of anyone, with a view or intent to extort or gain any money or property of any description, belonging to another, and shall, by intimidating him with said threat, extort or gain from him any money or property, every such offender shall be deemed guilty of robbery in the third degree."

Instructions No. 9 and No. 11 appear to be substantially the same definition. Both define an extortion.

The instructions given were erroneous as a matter of law. They permitted two separate offenses to be carved out of one criminal delinquency.

The verdict forms submitted to the jury on each of the eight defendants were in such form as to allow one or more of the defendants to be found guilty of first degree robbery under count three and others to be found guilty of extortion under count three.

Clearly these verdicts were improper in form. As to count three all defendants found guilty should have been found guilty of either extortion (third degree robbery) or first degree robbery. Their victim could have had but one state of mind when he parted with the checks.

Under the circumstances Pierce and Hunt cannot again be tried for first degree robbery since the conviction of the lesser offense is an acquittal on the greater degree of the offense. (*Green v. United States*, 355 U. S. 184, 2 L. Ed. 2d 199, 78 S. Ct. 221, 61 A. L. R. 2d 1119; *Price v. Georgia*, 398 U. S. 323, 26 L. Ed. 2d 300, 90 S. Ct. 1757.)

Therefore I would reverse the convictions as to all eight defendants and remand the case for new trials.

FONTRON, J., dissenting: This dissent must necessarily be brief, for time is at a premium. My disagreement with the majority opinion stems from a conviction on my part that prejudicial error occurred in the admission of rebuttal evidence. I refer primarily to the testimony of Darlene Criss and two Philadelphia police officers, George Fencl and Joseph Casson.

Mrs. Criss testified that following the preliminary examination she heard one of the defendants, whom she could not identify, make this statement: "What that little Mex [Gutierrez] needs was to have his throat slit." The majority of the court correctly concedes this testimony was inadmissible, but they shrug it off as "sheer after-the-fact hyperbole."

I am far from certain what this high flown expression is intended to imply. However, I harbor no illusion that the state intended to favor the defendants by calling Mrs. Criss to the witness stand. Her testimony, in my judgment, clearly contains the poisonous seeds of prejudice.

Testimony given by the Philadelphia police officers was equally damaging to the accused, if not more so. The ostensible reason for the appearance of these witnesses at the trial was to rebut the testimony of defendants Johnson and Manning, who attended a Black Power Conference in Philadelphia, in which they had denied any knowledge of a Black Guard organization and indicated it was an invention of the prosecuting officers.

The examination of the officers ranged far and wide over a variety of topics. It delved into the makeup of the conference, who was there (although neither had seen the defendants), the number of arrests that were made, the pendency of criminal charges against one of the leaders, the number of street gangs that existed in Philadelphia and the relationship between the Black Guard and RAM (revolutionary action movement). The officers also identified Black Guard organization and training manuals which were thereupon admitted into evidence.

This evidence far exceeded the bounds of permissible rebuttal, going substantially beyond that required to rebut the statements of Johnson and Manning. Moreover, the testimony was not relevant in any respect to the other six defendants who were convicted.

In my opinion the evidence elicited under the guise of rebuttal testimony, as it related to the composition and activities of the Black Power Conference, as well as to the organizational makeup and program of the Black Guard, was wholly inadmissible and its reception constituted prejudicial error. The Black Guard was not on trial in this action, nor were the defendants on trial for being among its members. The intensive inquiry conducted by the state into matters concerning the Black Guard was entirely collateral to the main issue and was well calculated to divert attention from the sole question to be decided—the guilt or innocence of the defendants.

For the reasons expressed herein, it is my opinion the defendants did not receive a fair trial. I would reverse the judgment and remand this case with directions to grant a new trial.