Nos. 45,703, 45,704, 45,708, 45,712, 45,713—Consolidated.

*In re* KEITH SANBORN (STATE OF KANSAS, *Appellee*, v. Vernon S. Pierce, et al., Defendants; KEITH SANBORN, Respondent in Contempt Proceedings, *Appellant.*)

(490 P. 2d 598)

Opinion filed November 6, 1971.

*R. K. Hollingsworth*, deputy county attorney argued the cause, and *Vern Miller*, attorney general, and *Keith Sanborn*, county attorney, were with him on the brief for the appellant.

*Everett C. Fettis*, of Wichita, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

HARMAN, C.: Appellant Keith Sanborn, county attorney of Sedgwick county, seeks annulment of seven convictions of direct contempt of court entered against him by the Sedgwick county district court upon each of which he was sentenced to pay a fine of $25.00.

The conduct found contemptuous occurred while appellant was acting as attorney for the prosecution in the jury trial of nine defendants charged with varying felonies whose convictions comprise the appeal in *State v. Pierce, et al.*, 208 Kan. 19, 490 P. 2d 584.

The principal trial in district court commenced March 24, 1969. The defendants were represented by Mr. Chester I. Lewis and Mr. Charles Scott. On the morning of April 8, 1969, the following proceedings occurred in the absence of the jury:

"THE COURT: Gentlemen, I have given much thought to the problems of —that have come up from time to time in regard to statements of counsel which were not warranted, objections which contained more than the legal points involved, and the fact that since this trial commenced we have been unable to start on time at any session. Henceforth, if there is to be a legal objection I will expect counsel, and counsel are ordered, to merely advise the Court that they object. If I need any legal reason for the objection I will ask counsel for the legal basis. In the event that there is a request to strike the testimony in addition to the objection, counsel may also request that the testimony be stricken. But there is to be nothing further said in regard to any objections leveled against testimony or evidence—physical evidence. In the event counsel feel it is necessary to argue concerning the admission of evidence or conduct of counsel, then request may be made to the Court for permission to argue, which may or may not be granted. But no argument is to take place without permission.

·    ·    ·    ·    ·    ·    ·    ·    ·    ·    ·

"Any violation of these rules—and these rules will be rules in effect during the remainder of this trial—and in the event of any violation it will be considered a direct contempt of this Court, and it is my intention to assess a fine of $25 upon each direct contempt action. I might add, what I will do is just have the court reporter tab the spot which I feel is contemptuous if it does occur, which I hope it doesn't."

Later on the same day, after the taking of certain testimony, the following occurred:

"MR. SANBORN: I'd like to respectfully ask your Honor to consider the legal import of a portion of the announcement you made at the beginning of the hearing. That has to do with making a general objection only without stating the legal ground of the objection. And I believe that it is both the duty and the obligation of lawyers when making a record to state the legal ground of their objection. And I request your Honor to—over the lunch hour to reconsider one portion of your ruling having to do with making a general objection only and ask you to modify it to the extent of—without getting into any argument, but to the extent of stating the legal basis, as I fear that it would so circumscribe the ability to make a record that it might—well, you can see the implications, I think.

"THE COURT: No, I can't.

"Mr. Sanborn: Well, the implication is that you have advised the lawyers that they may not state the legal grounds of their objection. And I believe that this exceeds the—well, it exceeds the—it prevents the record stating what is essential if there should be a review for the basis upon which offers were made.

"The Court: If I need help with legal reasons I have stated I will ask counsel for their legal reasons. If not, the Court can say that I shouldn't have done what I did. But as far as I am concerned there hasn't been any strictly legal objection throughout the course of this trial. I'm tired of it, and I'm tired of the arguing, and rightly or wrongly I'm going to shorten this matter up.

"Mr. Sanborn: Well, just so the record clearly shows that.

"The Court: I think it would be better if the reasons were stated, but they have not been stated in most instances with particularity; and so the ruling is going to remain the same."

## The following day, April 9, this occurred:

"Mr. Sanborn: Your Honor, with respect to one of the—I can only discuss one of the reasons I asked to see your Honor in chambers with counsel and with no one else present because that involves relationship of counsel and the Court, and it's not a matter of propriety for me to take it up other than with the Court and the counsel. However, I can—I know you've announced that you have to leave right away, so I can take up the second part of what I wish to take up. And I believe that the law is—we've done some research on it— I think the record should reflect this and I wish your Honor would take time to look at some of these things we've extracted from Wigmore, because the posture on appeal if only a general ground of objection is stated, I believe from reading these cases is that no appeal can be taken from any ruling which states only a general ground, and that that precludes appeal. I believe further that for—on the part of the State that it is not possible to conduct the examination with respect to certain types of evidence, and I refer to those upon which there are certain grounds and circumstances which they can be admissible under which are exceptions to certain general rules; and so far as our research has disclosed it is stated that the reason counsel must and should state his specific grounds is because no Court can have at his fingertips all the various rules of evidence and rules of law; and the appellate courts have frequently said that no trial court should be expected to do that. And when you're in the—

"The Court: Yes, but I want to do it. I don't mean to cut you off, but I'm not going to change my ruling.

"Mr. Sanborn: Well, I am trying to tell your Honor that it is part of the duty of an advocate to make a record.

"The Court: Yes.

"Mr. Sanborn: It is part of the duty of an advocate to examine his witnesses and to propound any question which he deems should be asked of the witness in order to bring out the facts and circumstances of which he knows which bear a relationship to his case.

"The Court: I agree.

"Mr. Sanborn: Even though he may not for some basis of legal ruling succeed in eliciting the testimony, still it quite often happens that in certain circumstances witnesses being unfamiliar with the Court and things of that

nature, they do under certain rules of evidence—and well recognized rules, I think—you have to ask certain questions in a certain way and you have to tell the Court the basis upon which you are asking the questions, sometimes the connection that it bears with other evidence to make a chain of circumstances; and to do that of course you have to rise, that's the rule of Court prescribed by the Supreme Court of this State and you have to address that to the Court. And so number one and the only part I think that I can properly discuss in the presence of anybody but counsel and the Court, and I've thought about this very deeply. I think that—I asked for this and I discussed it with Mr. Scott already, and I don't know what they believe the law to be, but I do believe that if a record continues to be made under circumstances when there are only general objections, from that time on all appeal on those matters will be—if I read these rules right—waived. And no way to bring it up at a later time. And I want the record to show what it has now shown with this being granted by the Court. And I have tried on several occasions and I still feel that it is— and the only way with propriety and I should and I think it's the only proper way is for the other thing that it not be discussed with any other person than the Court and the lawyers. Because that particular matter I know when you take anything like that up with the Court you are supposed not to take it up in the presence of other persons. And I know that you didn't have much time, that is, for this.

"But I've been trying to be able to do this on several different occasions, and I just think that this must be some time put in this record and done. Because it's affecting the ability to properly as an advocate conduct the examination of some of the witnesses.

"THE COURT: Well, my ruling is going to remain the same. I've already spoken to that point."

Later the same day the first adjudication of contempt occurred during the direct examination by appellant of a woman testifying for the prosecution. The record reflects the witness had previously given a written statement to an investigating officer concerning her knowledge of the case, to which appellant referred in the course of his examination in an effort to refresh her recollection as to the testimony desired. Counsel for defendants interposed an objection unless they were permitted to examine the document, with which position the court generally agreed. The record then reveals the following:

"Q. MR. SANBORN: Have you had an opportunity now to read—

"A. I didn't know if it was going to be taken away from me so I thought it would be best not to read it.

"THE COURT: You may read it.

"MR. LEWIS: Can she read it from the beginning, your Honor?

.    .    .    .    .    .    .    .    .    .    .    .    .    .

"Q. Is that what you told the officer?

"A. Well, it's down here on black and white, I still can't remember if I stated it in exact words or anything like that, but it's down here.

"Q. Well does it state substantially what you told him or not?

"A. It states here that he had received a phone call from his wife and that she was going to have a baby and that he would have to leave. If this is—are you talking about the whole gist of the thing? But on the majority of it I—I mean I—I can't recall exactly word for word if this is what I said and et cetera, but I mean it must be the gist of it.

"Q. From reading that does that refresh your recollection now?

"A. Not really. It still doesn't cause I—

"Q. Did you tell them the best you knew the truth at that time?

"A. Yes, I did.

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"Q. MR. SANBORN: Miss Spencer, you did not tell Officer Davis anything in regard to the—or any suggestion that Mr. Blake was intoxicated on that evening, did you?

"MR. LEWIS: I object.

"THE COURT: Overruled. You may answer.

"A. Oh, no, because he didn't ask me. They asked me what went—

"Q. MR. SANBORN: Thank you. You've answered the question. And you did not tell Officer Davis anything with regard to any statement about the circumstances of Frank Carpenter's leaving on that night, did you?

"MR. LEWIS: I object.

"THE COURT: Overruled.

"A. I have here that he left out cause his wife was gonna have a baby.

"MR. SANBORN: And what else did you tell him?

"A. Can I read it?

"MR. LEWIS: I object to what else.

"Q. MR. SANBORN: It's perfectly all right if you read it.

"THE COURT: Overruled. Go ahead, you may read it.

"MR. LEWIS: If the Court please, if it's introduced into evidence.

"THE COURT: All right.

"MR. LEWIS: I move to introduce it into evidence.

"THE COURT: Objection sustained. Let's admit it. I'm going to let her read it.

"MR. SANBORN: Excuse me, your Honor, did she mean aloud? I didn't mean to be instructing any witness that she be doing anything orally. I thought she meant read it without saying anything. I wasn't trying to make instructions about the thing.

"THE COURT: Tab the machine, please.

"A. Now what am I supposed to do?"

Later the same day, out of the presence of the jury, as to this incident the court stated:

"THE COURT: While you're looking I might announce that it is with deep regret that at 4:46 p. m. voluntary statements were made by Mr. Sanborn after an objection. I consider it a violation of the Order. Mr. Sanborn is fined $25 to be paid to the office of the Clerk of the District Court."

The second instance of contempt occurred April 10, 1969, during

the cross-examination by defendants' counsel of the custodian of records of Wichita State University, who had been offered as a prosecution witness and had testified concerning the attendance record of a certain person (not a defendant) at the university. This particular record had been identified and received in evidence as an exhibit. We are told the witness also had before him a folder containing other records pertaining to three of the defendants to which the witness had not testified or referred; that counsel for defendants opened the folder and removed these papers. Further events are depicted in the record as follows:

"*Cross-Examination by Mr. Lewis*

"Q. Well, they put something in the file where you can't get a copy of your transcript until the fines are paid or something like that?

"MR. SANBORN: Excuse me, your Honor. Those aren't records pertaining to this individual.

"(Whereupon Mr. Sanborn takes papers from Mr. Lewis's hands.)

"This witness brought these but they don't pertain to his examination.

"MR. LEWIS: Well, your Honor, he just snatches records out of somebody's hands?

"THE COURT: Tab your file. It's a violation of the Order of the Court. Now you may proceed, Mr. Lewis.

"MR. LEWIS: May I get these back, please?

"MR. SANBORN: Just a moment, I'd like to be heard on this, your Honor.

"THE COURT: The audience is to remain quiet.

"MR. SANBORN: Your Honor, may I please be heard on this?

"THE COURT: No, sir, you may not.   .   .   ."

The following transpired later:

"THE COURT: He wants to be heard. I want him to be heard now. That was a very rude display to try to jerk that out of Mr. Lewis's hand.

"MR. SANBORN: If the Court please, the records which were taken in hand were not records pertaining to this examination.

"THE COURT: And you, sir, have no authority to jerk anything out of anyone's hands in this Courtroom.

"MR. SANBORN: Which were records not in the possession of Mr. Lewis. They pertained to further examination in this case. And the contents of them were not subject to his inspection at that time as a matter of law. And the only means of calling this to the Court's attention was employed by counsel, meaning me. And I respectfully represent to the Court that there was no other possible way to keep those matters intact other than the course of action which was pursued, which is—I respectfully suggest to your Honor, the only course of action which could have brought this matter to the attention of the Court and at the same time have preserved the status quo ante with respect to those records.

"THE COURT: I want the record to disclose what occurred and the reason for the fine, the violation of the Order of this Court. Until I made the Order,

which is in the record, counsel in this case continually abused the usual procedures of the Court. There was continual harassment. The reputation of counsel in regard to conduct during a trial is well known. And it was for these reasons that the Order was issued, reluctantly so. But it became an absolute necessity if order was to be maintained throughout the rest of this trial. When Mr. Lewis picked up documents on the desk in front of the witness, which I didn't know what the documents were, it didn't appear that Mr. Lewis did, Mr. Sanborn immediately rose from his chair and proceeded to take the records from Mr. Lewis' hands. And then made statements to the Court, the part of the Order of this Court that no statements or argument was to be had with the Court without my permission, conduct in attempting to take the papers from Mr. Lewis' hand, his statements to the Court without permission, were contemptuous; and a fine of $25 is levied, to be paid by noon tomorrow with, of course, all appeal procedures and rights open to counsel whenever there is a fine of contempt of Court."

The third instance of contempt occurred April 16, 1969, during appellant's cross-examination of one of the defendants, John H. Manning, thus:

"Q. Thank you. And then you said to him, I was just as surprised as you were when you were hit, didn't you? In front of Reverend Reynolds and Dan Sawyer?

"A. No, you'll have to ask them. I didn't say that, man.

"Q. Well, you saw him get hit, didn't you?

"A. Mr. Sanborn, if you—

"Q. Your Honor, I request that—

"A. Now, wait a minute.

"Q. It's a simple question, he either saw him get hit, he can answer it yes or no, and he can answer it without making a speech.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"A. I'd have—you'd have to tell me what you consider a hit.

"MR. SANBORN: Your Honor, would you please advise him to answer my question?

"THE COURT: I don't remember the question.

"MR. SANBORN: The question was, whether this witness now on the stand when Blake and Reynolds and Sawyer were over at his house—

"THE COURT: No, your question was did he see Blake hit.

"MR. SANBORN: Yes.

"THE COURT: All right. Answer by whatever your definition of hit is.

"A. Okay. Well, I saw Richard Alexander and a—I don't know what the —what the conversation was at that time, Richard Alexander was—Blake was sitting here, Richard Alexander was sitting here. And Richard Alexander hit Blake on the back of the head like that, like I do some child. Now if you construe that as a hit, I certainly did see that. And Blake saw that and felt that.

"Q. Yes. And you said in this conversation I am asking you about, I was just as surprised as you were when you were hit, didn't you?

"A. I don't remember saying that I was surprised as he was, but I might have said I was as surprised—I'm surprised that you construe that as being hit. I don't know if I said that or not, but this is what—

"Q. And you further said, in fact I wish you would have given me a wink or a signal and the odds might have looked a little better.

"A. No.

"Q. He said that to you? Is that it?

"A. I didn't say that to him and he didn't say that to me.

"Q. Neither one?

"A. That wasn't said.

"Q. Thank you. That didn't occur in the conversation, that's what you're saying. And then you said, well, if you had hit anybody I was going to help you. You said that to him, didn't you?

"A. I don't know.

"Q. Tell the jury if you said that.

"MR. LEWIS: Just a minute, now, your Honor. He asked a question and I am going to object. I'm going to tell you.

"THE COURT: Just a minute, Mr. Manning. That's argumentative now, Mr. Sanborn. The witness is trying to answer it, and it may not come out as quickly as you might desire; but he has a right to answer these questions in the best way he knows how.

"MR. SANBORN: With all due respect, your Honor, I do not believe the witness is trying to answer my question. I think he is deliberately evading.

"MR. LEWIS: Your Honor, I object—

"MR. SCOTT: Your Honor, I am going to object as to—

"THE COURT: I want you to tab the machine."

After assessing the fine for this contempt the trial court made the following statement:

"There isn't any question but that Mr. Manning from time to time in his answers to Mr. Sanborn's questions is flippant. That is a personality contrast. And I will allow counsel to continue to ask the questions until a proper answer is given. But the demeanor of a witness and the weight to be given to his testimony is not a matter of comment by counsel. It's a matter for the jury to determine and weigh. And I consider it highly improper for counsel to state in front of the jury his opinion as to the demeanor and the weight to be given to the testimony of the witness. It is not up to Mr. Lewis, Mr. Scott, Mr. Cooley, Mr. Sanborn, or me, to decide whether a witness' testimony is correct or incorrect. It's up to the jury. And we have no right to comment upon that in front of the jury.

"My comments are not that Mr. Manning's testimony is always to the point. They are merely at times I have refused to admonish him because I don't feel that the answer called for admonishment. At other times I have admonished him. So pay your fine or appeal."

The fourth act held contemptuous took place April 18, 1969, during appellant's cross-examination of another defendant, Fred M. Johnson, as shown by the following:

"Q. What businesses, if any, are you associated with these men in?

"A. None presently.

"Q. What businesses have you been associated with them in?

"A. We endeavored to form a partnership to—as the founding partners of a hamburger snack bar called The Brothers. And this was an attempt to—

"Q. Thank you. And where was the location of this Brothers Restaurant?

"A. Can I answer the last question?

"THE COURT: If you didn't finish your answer, finish it.

"MR. SANBORN: Your Honor, I am not asking him other than what business ventures they were in, and I want to find the location.

"THE COURT: Tab the file, please. You may finish your answer, Mr. Johnson.

"A. This business was an attempt to set up the foundation whereby we could bring other young ghetto youth into some kind of economic awareness by setting up small shops around the community engaging them in their own business, assisting them via experts, expertise, that was made available to us in Johnson County, a very affluent area outside Kansas City, Kansas.

"MR. SANBORN: I would like to request that the reporter read my question, your Honor. This is not what I asked him.

"THE COURT: Have you finished your answer, Mr. Johnson?

"A. Yes, sir.

"THE COURT: Ask your next question, Mr. Sanborn.

"MR. SANBORN: I would like to know what the location was.

"A. The location was at 7th at—I believe 1701 North 7th Street."

Thereafter, as to this the court stated:

"At 4:03 p. m. Mr. Sanborn addressed the Court without permission which is a violation of the Order previously given in this case. The court reporter's transcript was tabbed."

The fifth act of contempt occurred also April 18, 1969, during appellant's further cross-examination of defendant Johnson reflected in the following:

"A. I was assistant director in charge of neighborhood services and community action. Also liaison to Model Cities assigned to the City of Kansas City, Kansas, to assist in implementation of the Model Cities Demonstration Cities application.

"Q. And you were also assigned by Mr. Hamms as a part of your duties to work with the J. A. C. S. people, were you not?

"A. No, that's not true.

"Q. You mean rather than Mr. Hamms assigning you, you volunteered to do that as you stated in your testimony?

"A. That's true.

"Q. And that was a part of the duties of your job to do that, wasn't it?

"A. No, it was not.

"Q. Now you stated to your counsel that you were familiar with the regulations pertaining to the operation of your agency, and your agency was the Community Action Agency, wasn't it?

"A. Yes, it is.

"Q. And you're familiar, of course, with Memorandum Number 76 from the Office of Economic Opportunity to the Community Action Program, aren't you?

"A. When is it dated, Mr. Sanborn?

"Q. November 21, 1967.

"A. I probably had a chance to peruse it, yes.

"Q. It's part of your duty to be familiar with these regulations as the Associate Director, isn't it?

"A. I would say yes. Yes.

"Q. And you are also familiar with Memorandum— you were working there in '66, were you?

"A. Yes.

"Q. You were familiar with Memorandum Number 18 from the same Office of Economic Opportunity to all community action programs, dated February 4, 1966, weren't you?

"A. Would you please read that memorandum to refresh my recollection?

"Q. I first want to know if as you stated after four years of working with this program and these memoranda, you are familiar with the memoranda and duties devolving upon you as a recipient of federal funds in administering a community action program.

"THE COURT: The witness has requested that you refresh his recollection. If you wish to pursue the line of questioning, you will refresh his recollection.

"MR. SANBORN: Are you familiar with a memorandum on the subject of CAP employment assistance directive to community action agencies regarding the Job Corps?

"A. Would you read that memorandum—both memorandums, Mr. Prosecutor?

"MR. SANBORN: Your Honor, I do not believe it's appropriate to have witnesses in Court questioning the lawyers. And I'd appreciate it if I could have answers to my questions rather than be subjected to an examination.

"THE COURT: Tab the file, please. Frankly, I think the question borders on the absurd. To expect an individual to remember a memorandum in 1966 is fantastic. And all he's asking is to get some information on the memorandum."

As to this act of contempt the court stated:

"At 4:14 p. m. Mr. Sanborn made a statement to the Court without permission, which was a violation of the former Order of the Court."

The sixth act occurred April 21, again during appellant's cross-examination of defendant Johnson, as follows:

"Q. What time of the day did you call Dan Sawyer's office.

"A. We have morning staff meetings at the Foundation from 8:00 o'clock until 11:00 sometimes, and I have my staff meeting of my staff after 3:00.

"MR. SANBORN: Excuse me. Your Honor, I only asked him what time he called Dan Sawyer's office. May I simply request that I have a responsive answer for my question with respect to the time he called Dan Sawyer's office?

"THE COURT: Tab your file. I asked that if the witness needed to be admonished that you merely advise me in terms only requesting me to admonish the witness. Now, answer the question, Mr. Johnson."

The last act of contempt likewise occurred April 21 during appellant's cross-examination of defendant Johnson, as shown by the following:

"Q. The question was, did you call the Wichita Police Department?

"A. No, I instructed LaVert to call.

"MR. SANBORN: I ask that the unresponsive—I ask that you ask the witness to answer the question I ask rather than some other question.

"THE COURT: Tab your file, please. Ask your next question, Mr. Sanborn."

In making its rulings on the last two contempts the trial court stated:

"At 3:09 and 3:16 p. m., Mr. Sanborn violated the order of this Court. Just prior to that, he was admonished that if the witness was to be told to answer the question in a manner other than which it was answered, he was merely to say, ask me to admonish the witness. Almost within a very short time thereafter, as the record will show, he requested admonishment in terms other than those directed by the Court. He violated that, as well as the original order given in this case to which reference has been made throughout the trial."

Appellant raises no procedural challenge to his convictions but makes multiple substantive attacks upon them. He says the order he is charged with violating was not clear and unambiguous, as it must be before he can be held in contempt. He contends it was unlawful, being in derogation of his duty as an advocate prosecuting his case in compliance with K. S. A. 60-404 and 60-405. Finally, he asserts his conduct was not disrespectful or contemptuous to the court, nor such as to interrupt or interfere with its proceedings or with the administration of justice. It is upon these latter grounds we broadly rely for reversal.

By statute a direct appeal from a contempt conviction is provided wherein this court may affirm, reverse or modify the judgment as justice may require (K. S. A. 20-1205). Upon such review this court has authority to examine the language or acts found to be contemptuous and determine whether they are sufficient to constitute contempt (*In re Gambrell*, 160 Kan. 620, 164 P. 2d 122). Appellant was adjudged guilty of that which is classified as direct criminal contempt. Generally criminal contempt is conduct directed against the dignity and authority of a court or a judge acting judicially, with punitive judgment to be imposed in vindi-

cation; its essence is that the conduct obstructs or tends to obstruct the administration of justice (17 C. J. S., Contempt, §§ 5[1], 8b.). This court defined it long ago in *In re Dill, Petitioner,* 32 Kan. 668, 5 Pac. 39, thus:

"To constitute a direct contempt of court there must be some disobedience to its order, judgment or process, or some open and intended disrespect to the court or its officers in the presence of the court, or such conduct in or near the court as to interrupt or interfere with its proceedings, or with the administration of justice." (p. 689.)

See, also, *Smith v. Clothier,* 113 Kan. 47, 213 Pac. 1071.

In making its seven findings of contempt the trial court uniformly ruled appellant had violated the April 8 order of the court. We cannot concur in this conclusion. Analyzing briefly, without detailed repetition, the events in question, we find in the first incident appellant was found guilty because he made "voluntary statements" after an objection. Here there had been considerable colloquy between the court and counsel for defendants, and the matter of the witness reading her pretrial statement had become somewhat ambiguous—did the witness intend to read the paper aloud in the presence of the jury or silently to herself? Appellant's statement appears to be no more than a request for clarification, couched in respectful terms, made at a time when there was no objection pending before the court.

In the second instance, taking records from Mr. Lewis' hands, it appears the latter had without notice to or permission from anyone removed papers from a folder brought into the courtroom by a prosecution witness. The papers referred to some of the defendants on trial and had not then been used or referred to in any way but were available for the prosecution's use in impeaching those defendants in the event they testified falsely. Once the papers had been examined by the other side, their value as impeachment tools would have been dissipated. At the same time appellant retrieved them, acting in what he considered an emergency, he explained his problem to the court, again in a respectful and factually accurate manner, and, when so directed by the court, did not persist in retention of the papers but promptly returned them to Mr. Lewis. The court conceded its lack of knowledge concerning their content despite appellant's plea to be heard prior to returning them. Patently the act of taking the papers was not in violation of the silencing order. Although discourtesy by any-

one should never be necessary and is not to be condoned, appellant's act seems to have been prompted by the unwarranted invasion of then private material rather than disrespect or contempt toward the court.

The third instance, occurring during appellant's cross-examination of a witness in which appellant commented that the witness was evading the question, came after a *defense* objection had been made upon which the court did not rule but instead addressed itself directly to appellant in a manner inviting colloquy. Appellant had made no objection but had simply repeated his question after the witness had declined to answer concerning his own purported previous statement, saying, "I don't know". There is no indication of bad faith on appellant's part. We do not pass on the propriety, from a purely legal standpoint, of the remarks made in the presence of the jury by either appellant or the court—we simply are unable to see contemptuous violation of the order here.

The fourth occurrence was appellant's restatement of his question to a defendant as to the location of a particular business enterprise. The defendant had already answered appellant's question but, as witnesses are sometimes wont to do, desired to do more. That this was the case is evidenced by the witness' further answer. Again appellant's remarks were respectful and not disruptive and we fail to see contemptuous violation of any order.

The fifth occurrence also came during cross-examination of the same defendant, who was employed as a supervisor by the Office of Economic Opportunity in its war on poverty in Wyandotte county, and had been one of the founders of the program. This defendant, along with the others, was charged with robbery and extortion of money from a representative of a private agency (JACS) whose mission was to recruit disadvantaged youth into the Job Corps program under OEO (see *State v. Pierce, et al.,* supra). The defendant had previously testified on direct examination he had received the money as a consultant's fee and that he had no duty by reason of his job to assist in Job Corps recruitment. It was the prosecution's theory that under his employment it was his duty to do that for which he claimed the consultation fee, that is, assist in Job Corps recruitment. This point became crucial in the case as to this witness. Appellant had in his possession two OEO numbered, dated memoranda on the subject upon which he wished to test the witness' credibility on this critical issue. Upon being di-

rected to refresh the witness' recollection as to the memoranda appellant read the title of one to the witness. The witness had first indicated his familiarity with OEO policy directives but he declined to answer the question with respect to the one identified to him by title and he addressed a request directly to appellant. Appellant responded to the request by the statement, addressed to the court rather than to the witness, for which he stands convicted of contempt. It is noteworthy in passing that later cross-examination, after considerable fencing and hedging by the witness, did result in his begrudging admission that by reason of OEO policy directives with which he was familiar he did have an official duty to further Job Corps recruitment. Beyond this, however, we see no improper conduct interfering with or impeding the trial.

The last two incidents involve appellant's requests to the court for help in securing responsive answers to questions, answers which were in fact forthcoming without embellishment once the court acted as requested. Instinctively in a heated trial experienced counsel will address their problem to the court, not only to advance their cause, but also to aid the court in making proper disposition of the matter at issue. This is particularly true in cross-examination of a hostile witness where, as here, the record reveals the examiner is justified in his appeal for help. The examiner is sometimes required to make clear to the court the reason for his request for help where the situation may not be otherwise apparent. Again we see no violation of the court's order. A judge must have power to protect himself from actual obstruction in the courtroom but at the same time it is essential to a fair administration of justice that a lawyer be able to make honest good-faith efforts to present his client's case (see *In re McConnell*, 370 U. S. 230, 8 L. ed. 2d 434, 82 S. Ct. 1288).

In none of the incidents do we see hostility or defiance toward the court on appellant's part, anything abusive or insulting, undue persistence in opposing any ruling, nor do we find open or wilful misconduct which can fairly be characterized as obstructing or tending to obstruct the procedure of the trial. The brief filed on behalf of appellee virtually acknowledges this conclusion in a statement contained therein as follows:

"Although the isolated comments which Appellant has chosen to abstract do not reflect conduct which interrupts or interferes with the proceedings or the administration of justice, taken as a whole and examining Appellant's prior

conduct, his comment was argumentative and was exactly that which he had been making for the eleven days since trial had started and which necessitated the order entered the day before on April 8, 1969."

There has been filed on behalf of appellee a lengthy counter abstract in which are included numerous excerpts from the trial transcript of events occurring prior to entry of the April 8 order. It has not been shown wherein appellant's abstract is incorrect or inadequate as to the events in question and the propriety of appellee's counter abstract may well be questioned. Nonetheless we have examined it. It does reveal appellant constantly addressed himself to the court in his comments rather than to opposing counsel—a practice not always reciprocated by the latter—and despite vigorous presentation appellant remained respectful to the court throughout. It also indicates the arduous and difficult nature of the task confronting the trial judge in the conscientious discharge of his duty—aggressive advocacy on each side appropriate to the heat of the particular skirmish; each side construing everything to its own advantage and seeking to leave nothing unanswered; frequent interruption with somewhat intemperate remarks all around; and, not the least, the presence of a volatile, partisan audience.

The judgments of conviction of contempt are reversed.

APPROVED BY THE COURT.